773 So.2d 943 (2000)
Alvin ROBINSON a/k/a Alvin Lenard Robinson a/k/a Bernard Hill, Appellant,
v.
STATE of Mississippi, Appellee.
No. 1999-KA-00340-COA.
Court of Appeals of Mississippi.
June 27, 2000.
Rehearing Denied September 5, 2000.
Certiorari Denied December 7, 2000.
*944 William Wayne Housley, Jr., Tupelo, Attorney for Appellant.
Office of the Attorney General by John R. Henry, Jr., Attorney for Appellee.
BEFORE McMILLIN, C.J., LEE, AND MOORE, JJ.
McMILLIN, C.J., for the Court:
¶ 1. Alvin Robinson was indicted for murder and tried before a jury in the Circuit Court of Lee County for the stabbing death of Jim Parks. Robinson did not deny that he purposely inflicted Parks's lethal wounds but contended that he was acting in necessary self-defense. The jury declined to convict for murder but returned a guilty verdict on the lesser offense of manslaughter. Robinson has now appealed his conviction. In a brief filed by his attorney on his behalf, Robinson raises ten issues. Robinson additionally filed a pro se brief in which he raises thirteen additional issues. We have considered the issues and find one of them to have merit. Therefore, we reverse and remand for further proceedings consistent with this opinion.

I.

Facts
¶ 2. Parks and Robinson became involved in a difficulty when Robinson executed a maneuver in the vehicle he was driving that caused a near collision with the vehicle driven by Parks. Parks began a pursuit of Robinson's vehicle that went for several blocks through the city of Tupelo and ended only when Robinson attempted to make a left turn and was stopped by a traffic signal. At that point, Parks and Robinson, in vehicles standing *945 side by side, exchanged hand signals intended to convey their mutual feelings of ill will. Parks then verbally offered, in rather crude language, to inflict a physical beating on Robinson. Robinson verbally accepted the challenge, expressing the view, at least impliedly, that Parks was not physically capable of succeeding in the enterprise.
¶ 3. The State's evidence suggests that both men then exited their vehicles and met on the street for the purpose of engaging in physical combat and that Parks began to inflict blows with his fist on Robinson. Robinson countered by striking back at Parks. However, upon exiting his vehicle, Robinson had surreptitiously armed himself with a double-edged knife kept in the dash of his vehicle. It took Parks some moments to realize that, rather than absorbing blows from Robinson's fists, he was actually being stabbed repeatedly in his torso. Parks, upon making that discovery, disengaged from the altercation and returned to his car. Robinson likewise returned to his vehicle and departed at a high rate of speed. Parks began an attempt to drive for assistance but was only able to drive a short distance into the parking lot of a convenience store where he died from blood loss while still sitting behind the wheel of his vehicle.
¶ 4. Robinson's version of events related by him at trial differs primarily in that he claimed that, after being chased down by the Parks vehicle, he remained sitting in his vehicle when Parks, without any real provocation, came around the side of his car, physically jerked Robinson out of his vehicle and began to administer a beating to him with his fists. Robinson claimed that he managed to grab the knife just as he was being dragged from the car, and that the stabbing was in necessary self-defense to protect him from serious bodily injury at the hands of an assailant who was some six inches taller and fifty-five pounds heavier than he was. Robinson denied that he had engaged in any preliminary confrontational exchanges with Parks, either through hand and finger signals or through the spoken word. Robinson's own testimony was the sole evidence of this version of events, since his companion in the vehicle that night testified as a witness for the State and verified that Robinson voluntarily exited his vehicle to confront Parks in response to Parks's challenge.
¶ 5. In considering the issues presented in this appeal, we will first discuss Robinson's challenge of the sufficiency of the evidence since, if that issue has merit, we would be compelled to reverse and render, thereby rendering moot all other issues presented on appeal. After dealing with that issue, we will turn to the issue upon which we find ourselves compelled to reverse and remand Robinson's conviction.

II.

The First Issue: The Sufficiency of the Evidence of Guilt
¶ 6. Robinson's attack on the sufficiency of the evidence in his brief dwells almost entirely on the lack of evidence of any premeditation or malice aforethought in the stabbing of Parks. This, as Robinson's counsel concedes in his brief, is an issue that relates solely to the charge of murder. "The killing of a human being without the authority of law by any means or in any manner shall be murder ... (a) [w]hen done with deliberate design to effect the death of the person killed, or of any human being." Miss.Code Ann. § 97-3-19 (Supp. 1999). The issue of the sufficiency of the evidence of murder was answered in Robinson's favor by the jury when it declined to convict him of that charge. That issue is moot.
¶ 7. Near the end of the passage of the brief dealing with this issue, Robinson suggests that the evidence that he was acting in self-defense was so overwhelming that the verdict, even as to manslaughter, cannot be permitted to stand. He cites in support of that proposition the case of Kirkland v. State, 573 So.2d 681 (Miss. 1990). In that case, the Mississippi Supreme *946 Court reversed a manslaughter conviction upon finding that the evidence that the defendant acted out of self-defense when he saw the victim reaching for a pistol was so compelling that the guilty verdict returned by the jury was against the weight of the evidence. Id. at 682. We find that argument unpersuasive in this case. In Kirkland, essentially all of the credible evidence pointed toward the fact that the victim was armed and preparing to open fire at the defendant. The only exception was one State's witness, who related a version of events from the stand that tended to inculpate the defendant. However, that witness's in-court testimony was substantially at odds with two previous statements consistent with the defendant's version that the witness had made shortly after the incident. Even then, the court did not find the evidence of guilt insufficient to convict. Rather, it simply felt "compelled to reverse and remand for a new trial before another jury." Id.
¶ 8. Even giving Robinson the benefit of the doubt and recasting his argument on the proof of self-defense as being one that the verdict was against the weight of the evidence rather than a challenge to the sufficiency of the State's proof, we find it without merit. In the case before us, there was ample credible proof that Robinson voluntarily submitted to an altercation upon a public street and that, without warning to his opponent and without any real indication that his opponent was armed, Robinson secretly armed himself with a deadly weapon and used it, by surprise, to inflict multiple stabbing wounds that led to his opponent's death within minutes of the combat. In reviewing the evidence as to this issue, we are obligated to consider that the jury disbelieved Robinson's claim that he was involuntarily dragged from his vehicle. See Watts v. State, 733 So.2d 214 (¶ 42) (Miss. 1999). Assuming, therefore, that the jury concluded that Robinson voluntarily entered into a mutual combat with Parks and that, in the process of that combat, Robinson purposely inflicted lethal injuries upon Parks that led to his immediate death, the jury was justified in returning a verdict of guilty of manslaughter. Wells v. State, 305 So.2d 333, 335-36 (Miss.1974). In an oft-cited treatise on the criminal law, the following passage concerning mutual combat appears:
When two persons willingly engage in mutual combat, and during the fight one kills the other as the result of an intention to do so formed during the struggle, the homicide has long been held to be manslaughter....
WAYNE R. LAFAVE ET AL., CRIMINAL LAW § 76, p. 574 (1972).
¶ 9. Whether seen as a challenge to the sufficiency or the weight of the State's evidence of Robinson's guilt, we find this issue to be without merit.

III.

The Second Issue:

The Batson Challenge to the State's Peremptory Juror Strikes
¶ 10. Robinson claims that the proscriptions against using peremptory jury challenges for racially-motivated reasons as announced in Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), were violated when the State used seven of its permitted twelve challenges to exclude prospective African-American jurors. Robinson urges that the race-neutral reasons offered by the State were so flimsy as to suggest that they served as a mere pretext to hide the State's true purpose of excluding, to the maximum extent possible, African-American jurors from a case that involved strong racial overtones. In the context of this discussion, it is necessary to note that Robinson was an African-American of somewhat small physical build and the deceased stabbing victim was a bearded white male, approximately six feet three inches tall, weighing 220 pounds, and described by one witness as having the *947 appearance of "a tall, Harley-Davidson man, big long beard...."
¶ 11. The Batson decision provides skeletal procedural directives for the trial court to follow in detecting and disallowing the practice of using peremptory challenges to systematically remove members of an identified racial group from jury service based upon nothing more than their racial identification. The first step is for the defendant to make a prima facie case, by some means convincing to the trial court, that the State is, in fact, engaged in such prohibited activity. Id. at 96, 106 S.Ct. 1712. Once that prima facie showing has been made, the burden shifts to the prosecution to state the reasoning behind the exercise of each challenge that barred a member of the identified racial group from jury service. Id. at 97, 106 S.Ct. 1712. The State must articulate a reason for the challenge that is deemed by the trial court to be race neutral on its face. Id. Even should the reasoning offered appear facially race neutral, the trial court must further consider whether the facially-acceptable reasons are, in fact, merely pretexts offered by the prosecution to camouflage its purpose of systematic exclusion of prospective jurors based on race. Id. at 97-8, 106 S.Ct. 1712. In a later case dealing principally with the matter of pretextual reasons, the United States Supreme Court observed that "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." Purkett v. Elem, 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995).
¶ 12. With that background in mind, we turn to the facts of this particular case. Because the case was a capital case, the State was given twelve peremptory challenges in the selection of a jury. Insofar as the record reveals, though it is not entirely clear, the State originally exercised eleven of its challenges in jury selection, eight of which were used to remove African-Americans from the jury. Prior to final jury selection, however, the State withdrew its strike of one African-American and she was selected for jury service. Therefore, ultimately, the State used ten challenges, seven of which were exercised against African-American venire members. The jury as finally selected contained only two African-Americans.
¶ 13. The trial court concluded, after the State had exercised peremptory challenges to systematically remove the first four African-American venire members to come up, that a prima facie case of discriminatory use of the strikes had been made out. The court, therefore, ordered the State to give its reasons for striking those potential jurors. After the State had offered its reasons, the defense was given an opportunity to respond. In an attempt to make the analysis more understandable, each challenged venire member will be considered separately, setting forth first the reason offered by the State, to be followed by the response offered by the defense.
¶ 14. A. Leonardo Bowdry. The prosecuting attorney indicated that, "I don't know if he was studying me to decide if he knew me or not, but I got a very long stare from him and I didn't know if it was hostile or not, so the State erred on the side of caution and struck [Bowdry]." The defense countered that Bowdry was employed as a supervisor at a local plant where he had worked for twelve years, was married to a medical technician who worked at the community's medical center, and that, insofar as the record showed, there was nothing to indicate his unfitness for jury service except for his race.
¶ 15. B. David Freeman. The State said that Freeman's juror information card revealed that he had one child and was not married. The prosecutor said, "I don't know if he's divorced or if it's an out of wedlock child. But if it is out of wedlock child that would speak to the State a certain irresponsibility...." The defense countered with information indicating that Freeman had been steadily employed at a local manufacturing concern for the past *948 ten years, suggesting that any assumption of irresponsibility on the part of Freeman was unwarranted and was being used by the State to camouflage its real intent of removing Freeman solely because of his race.
¶ 16. C. Cathy Blanchard. The State indicated that its reason for striking Blanchard was that she indicated on her information card that she was unmarried and had two children. Once again, the prosecutor admitted that he did not "know if it's out of wedlock children," but said it struck her "because it does not know." The defense countered with information that Blanchard worked as a circulation supervisor at the Lee County Library, indicating personal stability and strongly suggesting that the prosecution's unfounded hints of an irresponsible personal life were nothing more than a pretext to remove a well-qualified juror based on nothing other than her race.
¶ 17. It should be noted that, later during the jury selection process, the State somehow confirmed that Blanchard was, indeed, divorced, and withdrew its peremptory challenge. Therefore, Blanchard ultimately was seated as one of two African-Americans on the jury. Nevertheless, the Court considers the State's original handling of this challenge as informative in assessing whether, in considering the entire jury selection process in context, there appeared to be a conscious effort on the part of the Stateeven if not entirely successfulto systematically exclude potential jurors because those potential jurors were members of a certain racial group.
¶ 18. D. Linda Griffin. Griffin left blank the portion of her juror information card in which she was asked to reveal her marital status and number of children. The prosecution stated that it had struck Griffin because of uncertainty arising from the lack of this information. The defense countered with the proposition that Griffin's juror card revealed that she was a forty-seven year old woman who had eleven and one-half years steady employment at an organization known as Bio Clinic in Baldwyn, a small town in Lee County. Defense counsel contended that there was no legitimate reason to strike Griffin other than considerations of her race.
¶ 19. E. Wayne Gregory. Gregory was the first African-American juror challenged by the State after the trial court had concluded that a prima facie case had been made that the prosecution was using its peremptory strikes in an impermissibly discriminatory manner. He was struck, according to the State, because his address on Ida Street in Tupelo showed that he lived in a high crime area. The defense responded that Gregory's card indicated that he was gainfully employed at a local manufacturing facility, was married, and had one child, all of which demonstrated a stable personal life sufficient to overcome any adverse conclusions about his suitability as a juror that might be derived solely from his street address.
¶ 20. F. Fernando Cornelius. The State said it struck Cornelius because he was observed to be sleeping during "a healthy portion" of the voir dire. The defense noted that no complaint had been made about Cornelius's conduct during voir dire. (In that context, it should be noted that the record reveals that the State earlier sought to remove both prospective juror Bowdry (later peremptorily struck by the State) and Cornelius as a potential jurors by challenging them for cause on the same ground, i.e.,that they both slept during a portion of voir dire. At that time, the trial court denied the challenge for cause, saying "I didn't see anybody sleeping. I wish you'd have called it to my attention. I would have rudely awakened them.") Additionally, the defense noted that Cornelius was a thirty-two year old married man with two children, and that he was gainfully employed at a local industry, so that he appeared, on the record, to be a suitable juror in all reasonable respects.
*949 ¶ 21. G. Melodie Harris. Harris had failed to indicate on her juror card how long she had been a resident of Lee County, did not list her telephone number, and failed to provide a description of her specific job, though she indicated she was employed at Wal-Mart. The State said the uncertainty of the strength of Harris's ties to the community was the rationale behind its decision to peremptorily strike her.
¶ 22. H. Regina Ruff. The State said it struck Ruff because, during voir dire, she indicated that she had once served on a criminal jury that returned an innocent verdict. The defense, in response, noted that Ruff was a fifty year old woman who had a twelve year employment history with Sears, and that she appeared well-qualified for jury service in all reasonable respects and that the State had seized on her previous jury service as a pretext to remove her because of her race.
¶ 23. At the conclusion of the exercise that produced the above information, the trial court indicated that its sole duty was to "determine whether or not it's a race neutral reason that is offered." The court then determined that, in every case, the reason offered was race neutral and the court, on that finding, disallowed the defendant's Batson challenge to the manner in which the State had exercised its peremptory strikes.
¶ 24. The first problem that appears to this Court is that the trial court failed to consider the second, and more subjective, aspect of ruling on whether or not the State's challenges were racially motivated. Having determined the reasons offered were facially race-neutral, the trial court failed to move further to consider whether, based upon all the relevant considerations, it appeared likely that the State was voicing reasons that appeared race neutral on their face but which were intended to disguise the State's true purpose of excluding, to the maximum extent possible, members of the African-American community from service on this jury.
¶ 25. This Court, upon mature reflection, considers the evidence compelling that the prosecution, in this case having significant racial overtones, was indeed embarked on a course to purposely limit, as best it could, otherwise fully-qualifiedand even, perhaps, exemplaryjurors from service based upon nothing more than the proposition that these jurors shared the same race as the defendant in this racially-charged murder case (remembering that, though the defendant was ultimately convicted of manslaughter, at the time of jury selection the relevant charge was one of murder).
¶ 26. Since the Mississippi Supreme Court's decision in Hatten v. State, 628 So.2d 294 (Miss.1993), the trial court has been under a requirement to make findings of fact on the record to support the court's ultimate ruling on a Batson challenge. When these findings are subjected to review on appeal, the standard for appellate review is that the appellate court may not intercede unless the trial court's findings appear clearly erroneous or against the overwhelming weight of the evidence. Id. at 299. This Court faces something of a problem in that, as to a claim that the facially-valid reasons offered were nothing more than pretextual to hide the State's true purpose, we have no findings by the trial court. It has been the practice of this Court, in some instances where the necessary findings are lacking, to adopt a practice first followed by the Mississippi Supreme Court and remand solely to permit the trial court the opportunity to make those findings that provide the grist for the appellate mill. Williams v. State, 507 So.2d 50, 52-53 (Miss.1987); Salter v. State, 735 So.2d 1089 (¶ 1) (Miss. Ct.App.1999).
¶ 27. However, based on our review of this record, we find the reasons offered by the State to be so contrived, so strained, and so improbable, that we are persuaded that they unquestionably fall within the range of those "implausible or *950 fantastic justifications" mentioned in Purkett v. Elem that ought to "be found to be pretexts for purposeful discrimination." Purkett v. Elem, 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). Any delay in so finding to permit the trial court to explain its reasoning on the issue of pretext would, in our view, merely prolong the inevitable need to reverse and remand this conviction for a new trial at which the jury is selected without the State casting a jaundiced eye on the service of those African-American venire members who are otherwise entirely suited for jury service based solely on the fact of those venire members' race.
¶ 28. Our analysis that leads us to this conclusion includes the observation that two African-American venire members were struck based on a wildly-speculative assertion that they might be the parents of illegitimate children; one was struck because he seemed to be staring intently at the prosecuting attorney, even though the prosecutor himself was unable to sense any hostility or ill-will; and one was struck on allegations that he slept during a portion of voir dire, though the incident apparently went undetected by the trial court. We find these reasons, when viewed in the aggregate with the added understanding that they resulted in a statistically-significant exclusion of African-Americans from the jury, to be highly suspect.
¶ 29. Additionally, one venire member was struck because of his residence in a high crime area. Though it can be conceded that residence in a high crime area has, in the past, been accepted as a race-neutral reason to strike a potential juror in the cases of Baldwin v. State, 732 So.2d 236 (¶ 25) (Miss.1999); Gibson v. State, 731 So.2d 1087 (¶ 26) (Miss.1998); and Lockett v. State, 517 So.2d 1346, 1356 (Miss.1987), we find the countering evidence that the juror was a steadily employed family man with no other disqualifying traits to weigh heavily in favor of a finding that this potential juror's street address was nothing more than a readily-available pretext to exclude him because of his race.
¶ 30. Although other reasons offered to exclude other African-American venire membersprevious jury service on jury that acquitted the defendant (see Harper v. State, 635 So.2d 864, 868 (Miss. 1994)); lack of ties to the community (see Bradley v. State, 562 So.2d 1276, 1282-83 (Miss.1990); Chisolm v. State, 529 So.2d 630, 632-3 (Miss.1988)); and failure to provide vital personal information (see Brewer v. State, 725 So.2d 106 (¶ 78) (Miss. 1998))have been found race-neutral by prior case law, there is no requirement that every challenge be clearly objectionable in order to conclude that the State was impermissibly making a calculated effort to exclude as many African-Americans as could reasonably be done from the jury.
¶ 31. Viewed in the totality of the circumstances, we are satisfied that there are sufficient indications that something other than a race-neutral effort to select a fair and impartial jury to try this case was at work during jury selection process. Such practices are prohibited by the decision in Batson v. Kentucky. For that reason, this Court concludes that the conviction in this case must be reversed and this case remanded for a new trial.

IV.

Other Issues
¶ 32. Because certain other issues might arise once again on retrial, we will deal with them. Others, such as the claim that it was error to permit a relative of a police investigator to serve on the jury or that Robinson's counsel was ineffective in his efforts to defend him at trial, have been rendered moot by our decision to reverse.

A.

Photographs
¶ 33. Robinson claimed that photographs of the victim were improperly admitted for no purpose other than to inflame *951 the jury because of their gruesome nature. We conclude that the photographs are probative in this case as demonstrative of the nature of the struggle between these two individuals and the efforts of Robinson to inflict multiple severe laceration wounds on Parks. Though necessarily somewhat gruesome, their potential to improperly inflame the jury is not so great as to overcome their probative value under Mississippi Rule of Evidence 403 analysis. Burns v. State, 729 So.2d 203 (¶ 91-94) (Miss.1998).

B.

Double Jeopardy
¶ 34. Robinson had been tried previously on this charge and that trial had resulted in a mistrial when the jury could not reach a unanimous verdict. Robinson now alleges, without any supporting proof, that the earlier jury acquitted him of murder and was hung solely on the lesser crime of manslaughter. Thus, he contends that it was double jeopardy to retry him for murder. The absence of any proof beyond Robinson's own unsupported assertions that this was, in fact, the outcome of the earlier trial is fatal to this claim. However, on retrial, the verdict of guilty of manslaughter in this case does carry with it by implication a finding of not guilty of murder and any retrial must be limited to a charge of manslaughter. Price v. Georgia, 398 U.S. 323, 327, 90 S.Ct. 1757, 26 L.Ed.2d 300 (1970).

C.

Jury Instruction 24
¶ 35. Robinson argues that a jury instruction that basically tracked the manslaughter statute concerning unnecessarily killing another while resisting an attempt by the decedent to commit an unlawful act was hopelessly confusing because of its length and its failure to mention the possibility of self-defense. See Miss.Code Ann. § 97-3-31 (Rev.1994).
¶ 36. Our reading of the instruction satisfies us that it is an accurate recitation of the elements of manslaughter as defined in Section 97-3-31 and not particularly confusing based simply on its length. Id. As to its failure to mention the possibility that Robinson, in resisting Parks's efforts to assault him, may have been acting in necessary self-defense, we note that jury instructions are not meant to be read in isolation, but must be considered all together to determine if the jury has been adequately instructed on all aspects of the case, including the defendant's theory of his defense. Beckham v. State, 735 So.2d 1059 (¶ 14) (Miss.Ct.App.1999). In this case, the jury received a separate self-defense instruction that adequately informed the jury of the proper considerations it should employ in determining whether Robinson's efforts were necessary to defend himself from imminent injury under the law. Therefore, we find no error in the granting of the instruction as given.

D.

Robinson's Pro Se Brief Additional Issues
¶ 37. Robinson filed a separate pro se brief in which he purported to raise thirteen additional issues beyond those raised by his counsel on appeal. Many of them merely repeat arguments advanced by counsel, others have been rendered moot by our decision to reverse on the Batson issue and, even assuming for sake of argument that the issues had merit, we find that, with one exception, they have little likelihood of reoccurring in the event of a retrial.
¶ 38. The one exception is an evidentiary error alleged by Robinson that was not mentioned by his counsel. Robinson claims that the trial court erred in excluding evidence that, shortly before the confrontation with Robinson, Parks was heard to utter racially-offensive remarks in a bar where he and a companion were drinking beer and shooting pool. The trial *952 court excluded the evidence based on a determination that Robinson was unaware that the remarks had been made, so that the prejudicial effect of the evidence outweighed any possible probative value the evidence might have. We do not find this an abuse of the trial court's discretion in controlling the flow of evidence at trial. Fisher v. State, 690 So.2d 268, 274 (Miss. 1996). There was no real dispute that Parks was the initial aggressor in the fight. In fact, the State conceded as much on the record. Thus, the relevance of whether Parks's aggressive behavior had some racial origins or was based solely on his dissatisfaction with being abruptly cut off in traffic does not appear to offer any helpful information to the jury in deciding the fundamental issue of the case. The critical question was whether Robinson, in resisting Parks's assault, was using only the force necessary to defend himself or whether the surreptitious use of a deadly weapon was excessive, and therefore, "unnecessary" force within the meaning of Section 97-3-31. Miss.Code Ann. § 97-3-31 (Rev.1994). Because of the seeming lack of probative value of this information, and considering that knowledge that a crime victim may have harbored racial animosity tends to paint the victim in an unfavorable light for no good purpose, we find that the trial court did not err in excluding this evidence, even if it could arguably be maintained that it had some minimal probative value. See M.R.E. 403.
¶ 39. THE JUDGMENT OF THE CIRCUIT COURT OF LEE COUNTY IS REVERSED AND REMANDED. ALL COST OF THIS APPEAL ARE ASSESSED TO LEE COUNTY.
KING AND SOUTHWICK, P.JJ., BRIDGES, IRVING, LEE, MOORE, PAYNE, AND THOMAS, JJ., CONCUR.