# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-00143-COA

**JOHN CHADWICK GRIMES A/K/A CHAD GRIMES A/K/A JOHN CHAD GRIMES**                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                    **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 05/18/2021 |
| TRIAL JUDGE: | HON. JOHN R. WHITE |
| COURT FROM WHICH APPEALED: | ALCORN COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | LAURANCE NICHOLAS CHANDLER ROGERS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: CASEY B. FARMER |
| DISTRICT ATTORNEY: | JOHN DAVID WEDDLE |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 05/16/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., McDONALD AND SMITH, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1. John Chadwick Grimes was convicted of manslaughter by an Alcorn County Circuit Court jury and sentenced by the circuit court to twenty years in the custody of the Mississippi Department of Corrections, with ten years suspended and ten years to serve, and five years of post-release supervision. On appeal, Grimes argues that the circuit court committed reversible error by failing to investigate juror misconduct (i.e., conducting internet searches of legal terms and possible sentences during deliberations) that reasonably could have affected the jury's verdict. Grimes also argues that the jury was improperly instructed and that the circuit court erred in its admission or exclusion of certain evidence, including

testimony. After considering the briefs of the parties, the arguments of counsel, and the relevant caselaw, we reverse the circuit court only to the extent that it denied Grimes's motion for a new trial without holding an investigative hearing. We find that Grimes presented sufficient evidence of potential juror misconduct, warranting a hearing with the jurors to determine the nature and extent of the extraneous information that the jury considered and to determine whether the information reasonably could have affected the jury's verdict. On that issue, we reverse and remand for the circuit court to hold such a hearing. We find that all other issues Grimes raises have no merit or are procedurally barred.

**Facts**

*A.    The Fight*

¶2.    On April 28, 2017, Grimes came home from work to find his wife, Ashley, and their son on the porch crying. Ashley told Grimes that their son could not visit with her parents, Cammie and Ronnie Stewart, because Brooke Palmertree and her husband Chris ("Palmertree") were at the Stewarts' home, drinking. Brooke's son was also a grandchild of the Stewarts.[1]  Grimes said it upset him to see his wife and son disturbed over this. But Brooke disagreed with what Ashley told Grimes. Brooke testified that on that day, she had dropped some flowerpots off at the Stewarts' and asked the Stewarts to go out that evening. Cammie called her later, telling Brooke that she could not go and that she was upset because she apparently had had words with Ashley.

¶3.    Later that evening, Grimes and Ashley met their friends Chad Mitchell and his

---

[1] Brooke had been married to Ryan Stewart, who died several years before this incident. Ryan was the Stewarts' son and Ashley's brother.

2

girlfriend, Allyson Shapiro. After attending a birthday party, the group met Chad's brother Chris Mitchell ("Chris M."), and the five then proceeded to drive around the county and drink.

¶4. Meanwhile, after dining out, Brooke and Palmertree met Brooke's friend Kayla Mercer and Kayla's boyfriend, Greg Seago. The group proceeded to drive around Alcorn County that evening as well, drinking and socializing. Seago brought his gun with him.[2] At some point, Palmertree's truck became stuck in some mud, and he called a friend to help them get free. Seago helped, taking off his shirt to avoid getting muddy when he got under Palmertree's truck to hook the two vehicles together.

¶5. Cell phone records reflected that Grimes sent Brooke a text message at 10:51 p.m. saying that she and her husband should stay away from him or else he would beat them up.[3] Thirty-one more texts between Brooke and Grimes were sent over the next hour and a half. The insults escalated and threats of physical harm were exchanged.

¶6. After Grimes called Brooke, Palmertree called Grimes back. Thinking that the dispute was between Brooke and Ashley, Palmertree asked Grimes what was going on. According to Palmertree, Grimes went into "defense mode" and started threatening to beat up Palmertree. However, Grimes asserted that Chris called him, saying that "[Palmertree] was going to whip [Grimes's] 'skanky a**.'" Grimes replied that he would gladly give him the opportunity to do so.

---

[2] There is other testimony in the record that Seago picked up his gun later.

[3] Specifically the message said, "If u or ur husband come around me I will kick ur f****** ass so don't ever be around me I mean it just try me."

3

¶7.     Eventually, Palmertree and his friends met Grimes and his friends at the Aggy Mart convenience store in Kossuth, Mississippi.[4]  Before arriving there, Palmertree drove Seago and Kayla home and told them that they did not have to come with him and Brooke. However, Seago insisted on going.  At first, Palmertree denied that Seago did not like Grimes, but after his recollection was refreshed, Palmertree said:

> Right.  I mean, yeah, I mean, you're correct.  I mean it -- [Seago] just said, you know, he didn't really care for him [Grimes], you know, just didn't really care for Chad [Grimes].  To me that didn't have anything to do with me and Chad [Grimes], you know what I'm saying.  That's the reason I said, you know, [Seago] didn't need to come with me.

Kayla said that even though she knew there may be a fight, she and Seago decided to go with Palmertree and Brooke.

¶8.     Ultimately, Grimes, Palmertree, and their friends arrived at the Aggie Mart.  Grimes arrived first and was surprised when a shirtless Seago jumped out of Palmertree's truck first. Grimes knew the Seago family because years earlier, Grimes had been best friends with Greg's brother Chris Seago (Chris S.).  However, in 1998, Grimes and Chris S. were involved in an auto accident in which Grimes was driving, and Chris S. was killed.

¶9.     Grimes and those with him testified that Seago got out of Palmertree's truck first, and Palmertree followed.  Both stood in front of Palmertree's truck as Grimes approached them. Grimes testified he got so close that he could have touched the hood of the truck, and Seago and Palmertree were within arm's length of him on either side.  Allyson agreed that the three

---

[4] Although Palmertree said he just wanted to talk to Grimes, Brooke testified that she had sent a message to Cammie that they were on their way to the Aggie Mart—not for conversation but to fight.

4

were in front of Palmertree's truck, but Chris M. said that Grimes was about fifteen feet from Seago when Seago then yelled Grimes's name and something else and Seago threw up his hands. Grimes testified that Seago held his arms out in a provoking manner. Allyson said that she perceived Seago as being angry, aggressive, and wanting to fight. Chris M. agreed that Seago was acting aggressively. Grimes testified that he was scared and thought Seago was going to hit him. So instead of being attacked by both Palmertree and Seago, who substantially outweighed him,[5] Grimes turned and hit Seago in his jaw. All witnesses who were asked agreed that Seago was looking right at Grimes when Grimes hit him and that Grimes did not take any "cheap shot."

¶10. Brooke, Palmertree's wife, testified that she was sitting in the back seat of Palmertree's truck, and her view was partially blocked by the headrests and rear-view mirror. She said that when they arrived, Palmertree got out of their truck first, and then Seago got out. She said Grimes started running "full blast" at Palmertree but suddenly turned toward Seago. She could not see what happened thereafter. But Palmertree testified that when he got out of the truck, he looked straight ahead at Grimes walking, not running, toward him. Palmertree started walking towards Grimes when Grimes veered off. Palmertree did not see what Grimes did at that point in time.

¶11. After Grimes struck him, Seago fell and his head hit the pavement. Grimes jumped on him and threw a few more punches before he realized Seago was offering no resistance, and Grimes got up. At that point, Palmertree tackled Grimes, and the two began fighting,

---

[5] At the time Grimes was 6'0" and weighed 160 pounds. Seago was 5'10" and weighed 255 pounds.

moving into the view of the Aggie Mart surveillance camera.[6] The tape showed Palmertree on top of Grimes, hitting him. Ashley joined them, trying to separate them, and in the process, she too threw a few punches at Palmertree The video showed Ashley, Chris M., Chad, and Allyson circling Palmertree and Grimes as they were on the ground, fighting. They attempted to stop the fight and eventually, a car drove past them and the driver told them that the police were on the way. The parties separated and all got to their feet and moved out of the camera's range.

¶12. According to Allyson, Palmertree went back to his truck to check on Seago. Grimes followed him. Kayla and Brooke had called 911 and tended to Seago, who was breathing but not conscious. Brooke said something, and Grimes shoved or backhanded her. Then Palmertree pulled his shotgun out of his truck and shot in the air. Grimes retreated and drove off. As he left, Palmertree fired the gun, but no one was shot.

¶13. All witnesses testified that the entire fight lasted two to three minutes and appeared to be a typical fight. Seago was taken to Magnolia Regional Health Center in Corinth, Mississippi, and later transferred to Region One Health in Memphis, Tennessee, where he died on May 19, 2017.

    B.    The Trial

¶14. On September 6, 2017, Grimes was indicted for second-degree murder of Seago

---

[6] The surveillance camera that would have captured the Grimes-Seago altercation that occurred on the side the building was not working.

pursuant to Mississippi Code Annotated section 97-3-19(1)(b) (Supp. 2015).[7] The parties participated in extensive discovery before trial which included depositions of most of the eyewitnesses.

¶15. On April 5, 2019, the circuit court heard several pre-trial motions and the trial began on April 19, 2019. Those testifying included Grimes, Ashley, Allyson, Chris M., Kayla, Palmertree, Brooke, and two medical experts who established that Seago died as a result of Grimes's assault. The deceased's half-brother, Michael Seago, also testified as well as Cammie Stewart, and law enforcement personnel. When Kayla was asked by Grimes on cross-examination whether Seago had been in any prior fights, Kayla answered that Greg had, back in high school. The State objected. After a bench conference, which was not recorded, the court sustained the objection, giving no reason on the record for its ruling, and Grimes did not pursue any further questioning on that issue either with Kayla or any other witness during the trial.

¶16. The State called Michael Seago, the victim's brother, who testified that in 1998, another brother, Chris Seago, was killed in an auto accident where Grimes had been driving.

---

[7] This section provides:

(1) The killing of a human being without the authority of law by any means or in any manner shall be murder in the following cases:
. . . .
(b) When done in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual, shall be second-degree murder[.]

Miss. Code Ann. § 97-3-19(1)(b).

7

Michael testified that ten years after that accident, he and Greg saw Grimes, who thanked Michael for not harboring any bad feelings toward him about the accident. Greg commented to Michael that Grimes's apology seemed sincere. Michael said he spoke to Greg almost every day prior to Greg's death, and Greg never harbored any animosity toward Grimes.

¶17. After calling several other witnesses,[8] the State rested, and the circuit court denied Grimes's motion for a directed verdict. In addition to Grimes, Cammie testified for the defense. She stated that after the fight at the Aggie Mart, Palmertree came to her house and said that he had told Seago and Kayla not to come, but Seago said, "[N]o, man, I am going with you. I know how he rolls. He is the one that killed my brother."

C.    *Jury Instructions and Deliberations*

¶18. At the close of testimony, the court instructed the jury, including an instruction on "mutual combat" given over Grimes's objection. The instruction read:

> When two persons willingly engage in mutual combat, each with the intent to kill or do serious bodily injury to the other, and one or more of said persons does, in fact, kill the other, the homicide has generally been held to be manslaughter.

Grimes also submitted, and the court gave, three instructions relating to self-defense. In addition, the court granted Grimes's request for an instruction on the excuse of sudden

_____

[8] In addition to Michael, the State also called a witness to authenticate and enter a tape of the 911 call that Kayla made that night. Deputy Sheriffs Chris Settlemires and Jerry Mayhall, the first law enforcement officers on the scene, also testified about their activities that night. Investigator Byron Parker testified about photographs that he took of Palmertree's vehicle and the scene, as well as photographs taken of Seago at the Magnolia Hospital Emergency Room. Parker also interrogated Grimes the next day. Parker authenticated a videotape of that interrogation, which was entered into evidence and played for the jury. Parker also identified photos he took of Grimes's swollen and bruised hands at the time.

8

combat, one of which included the following language:

> The Court instructs the jury that the killing of any human being by the act, procurement, or omission of another shall be excusable:
>
> . . . .
>
>> (c) when committed upon any sudden combat, without undue advantage being taken, and without any dangerous weapon being used, and not done in a cruel or unusual manner.

¶19. During deliberations, the jury asked the circuit court for a list of definitions for "depraved heart." The State suggested a definition found in the case of *Westbrook v. State*,[9] to which the defense agreed. The circuit court then submitted an instruction that read:

> The Court instructs that depraved-heart murder and culpable negligence manslaughter are distinguishable simply by degree of mental state of culpability. In short, depraved-heart murder involves a higher degree of recklessness from which malice or deliberate design maybe implied.

After further discussion, the jury returned a verdict of "not guilty" on the charge of second-degree murder but convicted Grimes on the lesser-included offense of manslaughter. On May 18, 2021, the circuit court held a sentencing hearing, considered numerous letters and testimony supporting both Grimes and the victim, and sentenced Grimes to a term of twenty years in custody, with ten years suspended and ten years to serve, followed by five years of post-release supervision.

### D. *Grimes's Motion for JNOV or New Trial*

¶20. On June 4, 2021, Grimes filed a motion for a judgment of acquittal notwithstanding the verdict (JNOV) or a new trial. In his motion, Grimes raised several evidentiary issues

---

[9] *Westbrook v. State*, 29 So. 3d 828 (Miss. Ct. App. 2009).

but also raised jury misconduct, which he had learned about only after the verdict was rendered. After the trial, Grimes's attorney wrote to the jurors and invited them to discuss the case with him. One juror, Janice Parrish, responded. Parrish said that the jury apparently had been dissatisfied with the Court's supplemental instruction and that several of the jurors did their own internet search on their cell phones for definitions of "depraved heart." According to Grimes's attorney, the jurors also searched for "other terms foreign to them." The jury then went further and searched the internet for the possible sentences that Grimes could receive. After talking for several minutes with Juror Parrish, Grimes's attorney recorded the rest of his conversation and included it in Grimes's motion for JNOV:

JP:     And then we got to looking at what the sentence was for all of these because we wanted to know we wanted to know what the sentence would be.

CR:     It took ya'll a long time so ya'll obviously did a whole lot of deliberating back there.

JP:     We did.

CR:     Was a lot of that to try to sift through the evidence I guess or was it arguing or what were ya'll . . . what was taking so long . . . just a hard decision?

JP:     Right because like I said we didn't want to do it wrong.

CR:     Right.

JP:     We didn't want, we didn't want it to do, we didn't want to do Chad wrong and we didn't want to do the Seago family wrong if you know. And you know what, I did not know what the Judge sentence gave him on Monday because that has not been, has not been in the paper or anything yet. Are you allowed to tell me?

CR:     Well, I can tell you that he has not been sentenced yet.

10

JP:     Ok, because he said he was going to sentence him on May 10.

CR:    It's been, it was, we moved it because [of] a conflict with that date. But did that factor into ya'lls decision what a sentence might be?

JP:     Yes, we looked it up. Because we looked up what the sentence for like murder II was. That he could even get as long as a life sentence and then we looked up the manslaughter and it said he could get as little as a $500.00 fine up to I think 10 years or something you know. And we were hoping . . . what I would have loved to have seen happen was that he could get some help, they all needed it, but some help with drinking and cause that was two involvements that brought him to the law because of the Seago guy's brother and now this so the drinking had escalated and you know something bad happened. So my obviously my wish was that they could put him into some kind of a program to help him about his drinking and his anger management.

CR:    Well, I mean was there talk about "what" "hey he will get this much time or won't get that much time," was that discussed as part of the decision?

JP:     Yes, we googled to see what the sentence was for like that murder II with depraved heart. We looked to see what the sentence was in MS for that and we looked up the MS sentence for manslaughter and so we wanted to know what he could possibly get for those because like I said we knew that he . . . that was the one take we got from when you putting him on the stand this man has 4 children that he needs to support and . . . .

¶21.    On January 14, 2022, the circuit court summarily denied Grimes's motion; however,

on the issue of juror misconduct, the court specifically stated:

> Following the trial and conviction, but prior to sentencing, defense counsel was contacted by Juror No. 5, Janice Parrish, around May 12, 2021. The record reflects that Ms. Parrish notified defense counsel of potential juror misconduct, by which some juror(s) "googled" the lay definition of depraved heart, as well as the potential sentences for second degree murder and manslaughter. When a claim of juror misconduct arises, the trial court must first determine if an investigation is necessary. *Murry v. State*, 218 So. 3d 303, 307 (Miss. Ct. App. 2017). In deciding if an investigation is warranted, the trial court must find "good cause exists to believe that there was in fact an

11

improper outside influence or extraneous prejudicial information." *Id.* Thus, when a trial court finds "good cause to believe there was improper influence on the jury, the court should conduct a post-trial hearing" and "determine whether the communication was made and the nature of the communication." *Id.* Upon finding that improper communication was made and learning the nature of the improper communication, the trial court then is tasked with deciding "whether it was reasonably possible that the communication altered the verdict."

Based on Defendant's proffered allegations of Ms. Parrish's statements, this Court finds there is no good cause to believe there was improper influence on the jury. The Supreme Court said it best when it endorsed the findings of the trial court in a similar case, involving jurors looking up standard dictionary definitions of "neglect" and "abuse," when it quoted Judge Johnson's finding that

> [c]ases must be decided by juries upon the evidence presented in court and without extraneous evidence, investigations or improper influences or information. However, it must surely be recognized that jurors do not deliberate and decide cases in a vacuum. Twelve citizens of various backgrounds, educations and life experiences consult with one another about the case and ultimately render their individual and collective verdict based upon the evidence received and the instructions on the law from the court. *Rutland v. State,* 60 So. 3d 137, 143 (Miss. 2011).

¶22. The circuit court concluded that the evidence before the Court in this case is like that in *Rutland* except that the act of "googling" has replaced the use of a dictionary, yet the conclusions ring true. The court stated that like both the trial court and Supreme Court in *Rutland* with their fact scenario, the circuit court found that the common definition of "depraved heart" and the potential sentencing discrepancies "are not the type of improper extraneous information that have been found to invalidate jury verdicts in our case law. There is nothing inherently prejudicial in the definitions or as applied to this case." Furthermore, the circuit court held, the content which was "googl[ed]" is clearly something

12

within the collective intelligence and common knowledge of any jury. Finally, the court said that "[t]here is a very strong legal presumption that jurors follow the law, as they are instructed by the court. To engage in speculation otherwise, without a sound basis, would be contrary to the foundations of our jury system."

        *E.*    *Appeal*

¶23.   On January 28, 2022, Grimes appealed.[10] Grimes contends that the circuit court erred in numerous ways, including failing to investigate juror misconduct, submitting the State's mutual combat instruction to the jury (which when combined with a self-defense sudden combat instruction allegedly confused the jury), precluding proof of Seago's reputation in the community and specific acts of violence, admitting the final autopsy report and testimony from medical doctors (which was not given to a reasonable degree of medical certainty), and excluding the pathology report showing drugs in Seago's blood at the time of the fight.

**Discussion**

    **I.**     **Whether the circuit court erred by not investigating juror misconduct to determine if improper outside influence or extraneous prejudicial information reasonably could have altered the jury's verdict.**

¶24.   Grimes contends that the circuit court erroneously failed to investigate whether there was extraneous prejudicial information considered by the jury that reasonably could have

---

[10] We note that Grimes filed his JNOV motion on June 4, 2021, and that the circuit court did not rule on it until January 2022. Pursuant to Rule 25.3 of the Mississippi Rules of Criminal Procedure, Grimes's motion was denied by operation of law on the thirtieth day after the day the motion was filed, making his appeal untimely. However, pursuant to Rule 2(c) of the Mississippi Rules of Appellate Procedure, we may suspend the sanction of dismissal for good cause. Because of the importance of the issue presented, we find such good cause exists for us to consider the merits of Grimes's appeal.

13

altered its verdict. We review the trial court's decisions concerning jury influence for an abuse of discretion. *Murry v. State*, 218 So. 3d 303, 307 (¶17) (Miss. Ct. App. 2017). "Abuse of discretion is found when the reviewing court has a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *Willis v. State*, 348 So. 3d 1035, 1039 (¶12) (Miss. Ct. App. 2022).

¶25. In *Gladney v. Clarksdale Beverage Co.*, 625 So. 2d 407, 418-19 (Miss. 1993), the Mississippi Supreme Court explained the procedure that a trial court should follow when dealing with purported extraneous jury influence. The Court explained that when an allegation of juror misconduct arises, the circuit court must first determine whether there is good cause to warrant further investigation by the court. *Id.* at 418. "In order for the duty to investigate to arise, the party contending there is misconduct must make an adequate showing to overcome the presumption . . . of jury impartiality." *Id*. "At the very minimum, it must be shown that there is sufficient evidence to conclude that good cause exists to believe that there was in fact an improper outside influence or extraneous prejudicial information." *Id.* at 419. "Although a minimal standard of a good cause showing of specific instances of misconduct is acceptable, the preferable showing should clearly substantiate that a specific, non-speculative impropriety has occurred." *Id*.

¶26. After a party presents a threshold showing of good cause that a jury may have been exposed to improper outside information, *Gladney* indicates that the trial court should conduct a post-trial investigative hearing. *Id.* At such a hearing, which could include

14

questioning jurors about the extraneous information, "the proper procedure is for the judge to limit the questions asked the jurors to determine whether communication was made and what it contained." *Id.* When the trial court determines that the communication was made and what the contents were, "the court is then to decide whether it is reasonably possible that this communication altered the verdict." *Id.*

¶27. The same procedure is followed in criminal cases when a defendant seeks a new trial based on juror misconduct pursuant to Rule 25.1(b)(4) of the Mississippi Rules of Criminal Procedure, which provides:

> The court, on written motion of the defendant, may vacate any judgment and grant a new trial for the grounds set forth in section (b).
> . . . .
>
>> (4) if the jury has received any evidence, papers or documents, not authorized by the court, or the court has admitted illegal testimony, or excluded competent and legal testimony[.]

A criminal defendant must also show that he was prejudiced as a result of the jury's misconduct. *Rutland*, 60 So. 3d at 143 (¶23) (citing *Brister v. State*, 86 Miss. 461, 38 So. 678 (1905)).

¶28. It is imperative, however, that the defendant present his allegations that jurors considered extraneous information in a manner that is permissible under Mississippi Rule of Evidence 606(b), which prohibits jurors from testifying about what made them vote as they did. The Rule provides:

> (b) During an Inquiry into the Validity of a Verdict or Indictment.
>
>> (1) Prohibited Testimony or Other Evidence. During an inquiry into the validity of a verdict or indictment, a juror may not testify about any

statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

(2) Exceptions. A juror may testify about whether:

(A) extraneous prejudicial information was improperly brought to the jury's attention; or

(B) an outside influence was improperly brought to bear on any juror.

MRE 606(b).

¶29. The importance of presenting the threshold evidence of juror misconduct in accordance with Rule 606(b) was underscored by the Mississippi Supreme Court in *Rutland*. In that case, Rutland was indicted for child abuse. *Rutland*, 60 So. 3d at 139 (¶7). During deliberations, the jury sent out a question to the court asking, "Is negligence the same thing as abuse?" *Id*. at 140 (¶8). The trial court responded with a handwritten note saying that the jury "must rely on the Court's instructions on the law already given to you. Please continue your deliberations." *Id*. After the jury convicted Rutland, one of the jurors told Rutland's boyfriend that two jurors had looked up definitions of "abuse" and "neglect" in the dictionary and determined that both words meant the same thing. *Id*. at (¶9). Rutland filed a motion for a JNOV or a new trial, claiming among other things that the jury used improper extraneous information during the deliberations. *Id*. at (¶10). The trial court denied Rutland's motion, and the Court of Appeals affirmed. *Id*. at 138 (¶1). The Mississippi Supreme Court granted certiorari and held that the juror's statement of his reliance upon the

16

extraneous information could not be considered because the juror could only testify about the extraneous information, not how that information influenced the verdict. *Id*. at 143 (¶21). The Court stated:

> Rutland bases her argument on the assertion that the jury improperly used the definition of neglect to reconcile the supposed differences between abuse and neglect. This argument is based on a juror's statement that "he and another juror were confused about the definition of the word 'neglect' so they looked up the word in a dictionary and concluded that the words 'neglect' and 'abuse' meant the same thing, so they determined that the Defendant was guilty of child abuse." The juror's statement relates to how extraneous information affected the jury's verdict. Thus, the juror's statement is improper under our Rules of Evidence. Rutland may not base her argument for a new trial on a statement that is prohibited by our Rules.

*Id*. at 154 (¶22).

¶30. The *Rutland* court further found that the defendant was not prejudiced because the jurors had not been given the dictionary by the judge, which the Supreme Court had previously held would have established a presumption of prejudice. *Id* at 144 (¶30).[11] Moreover, Rutland had not presented evidence of which dictionary the jurors used or what specific definitions they saw for the court to determine if the definitions differed from the law. *Id*. at 145 (¶32).

¶31. In *Roach v. State*, 116 So. 3d 126 (Miss. 2013), the Mississippi Supreme Court considered a claim of juror misconduct Roach raised in a motion for post-conviction relief (PCR). *Id*. at 130 (¶9). In addition to claiming that he was entitled to a new trial based on newly discovered evidence, Roach claimed that a juror had been exposed to extraneous

---

[11] In *Collins v. State*, 701 So. 2d 791, 796 (Miss. 1997), the supreme court held that a presumption of prejudice arises when the trial court gives the jury a legal dictionary to consult during deliberations.

information supplied by law enforcement during his trial. *Id*. at 128 (¶1). Roach submitted the affidavit of Juror Tate, in which Tate explained that during the trial, he had approached two police officers, who were the State's witnesses, and asked them how much time Roach would get if he were found guilty. *Id*. at 129 (¶3). According to Tate's affidavit, the officers replied that Roach would have to serve between five and eight years. *Id*. Tate said in his affidavit, "As a result of being so advised, I voted guilty." *Id*. The trial court held a hearing on Roach's PCR motion, which the court later denied. *Id*. at 130 (¶9). The Court of Appeals affirmed, although the dissent would have remanded for further hearing to reconvene the jury and determine if other jurors were exposed to the information and if it were reasonably possible that the information impacted the verdict. *Id*. at 130 (¶11).

¶32.    The Mississippi Supreme Court granted certiorari and analyzed whether Roach made a prima facie case (or "good cause") of extraneous influence on the jury that required the trial court to conduct another hearing. *Id*. at 131-34 (¶¶16-24). The supreme court began by reiterating the procedure set out in *Gladney*.[12] After reviewing the testimony at Roach's PCR

---

[12] The Court stated:

[T]he Court has established a procedure for trial judges to employ when allegations of juror misconduct or extraneous information arise. *Gladney*, 625 So. 2d at 418. When the trial court is made aware of potential juror misconduct or improper influence on the jury, the first step is to determine whether an investigation is warranted. *Id*. An investigation is warranted if the trial judge finds that "good cause exists to believe that there was in fact an improper outside influence or extraneous prejudicial information." *Id*. at 419. If the trial court determines there is no "threshold showing of external influences," the inquiry stops there. *Id. See also Payton*, 897 So. 2d at 954 (¶135). If the trial judge has "good cause to believe" there was improper influence on the jury, the court should conduct a post-trial hearing. *Gladney*, 625 So. 2d at 419. The second step is to determine whether the

motion hearing, the supreme court noted that Tate's account was not corroborated by law enforcement and stated that "giving deference to the trial judge's determination of the credibility of witnesses, we cannot say that the trial judge erred in concluding that Roach failed to prove that there was good cause to believe the jury had been exposed to extraneous prejudicial information." *Id*. at 134 (¶124).

¶33.    In summary, if the allegations of potential jury misconduct comport with Rule 606(b), then the trial court is to conduct a hearing to determine the specifics of the misconduct, as was done by the trial court in *Murry*, 218 So. 3d at 305 (¶5).   In that case, Murry was convicted of aggravated assault. *Id*. at (¶3).  After the verdict was rendered, Murry learned that during his trial one of the jurors, Dennis Harris, initiated improper contact with Murry's fiancée Laronda Brooks. *Id*. at (¶4).  Murry filed a motion for a JNOV or a new trial based on this alleged jury misconduct. *Id.*  The circuit court convened a hearing and heard testimony from both Harris and Brooks; Brooks said that Harris initiated the contact, and Harris said the opposite. *Id.* at 305-06 (¶¶6-11).  The circuit court held that despite the improper communication between the two, the contact failed to alter the jury's verdict and denied Murry's post-trial motions. *Id.* at 307 (¶13).  On appeal, a majority of this Court reversed and remanded the case for a new trial. *Id.* at 309 (¶25).  The majority faulted the

---

communication was made and the nature of the communication. *Id*. Finally, if the investigation reveals that the communication was made, the court must determine whether it was reasonably possible that the communication altered the verdict. *Id*.

*Roach*, 116 So. 3d at 132 (¶17).  It should be noted that *Roach* did not mention any requirement of  showing prejudice by the defendant.

19

circuit court for concentrating on whether Brooks purposefully initiated the contact, rather than determining whether the communication between Brooks and Harris reasonably could have altered the verdict. *Id.* at (¶23). Citing *Roach*, the majority stated that if the court's "investigation reveals that the communication was made, the court must determine whether it was reasonably possible that the communication altered the verdict." *Id.* at 307 (¶17). The majority held that there was such a reasonable possibility because

> [r]egardless of who first initiated the contact and when the contact was disclosed, the record is clear that inappropriate contact and communication repeatedly occurred between Harris and Brooks during and after Murry's trial and that this improper contact resulted in juror misconduct. The established contact between Harris and Brooks evidences a motive on Harris's behalf to alter or impact the verdict to pursue his interest in Brooks. As stated, following the jury's verdict, Harris sent Brooks almost nude pictures of himself and suggestive messages stating that he would take care of her if she treated him right.

*Id.* at 309 (¶24).

¶34.    In the case at hand, Grimes's jury struggled with the definition of "depraved heart" and asked the circuit court for direction. With the agreement of both the State and Grimes, the court fashioned a supplemental instruction and submitted it to the jury. After his conviction of the charge of manslaughter, Grimes learned that several jurors were not satisfied with the circuit court's supplemental instruction and, on their cell phones, searched the internet for definitions of "depraved heart." In addition, according to Grimes's attorney, the jurors also searched for "other terms foreign to them." The jury then went further and searched the internet for the possible sentences that Grimes could receive.

¶35.    In its order summarily denying Grimes's motion on the issue of juror misconduct, the

circuit court correctly stated the procedure it should have followed, but the court did not follow it. Instead of determining whether Grimes had shown "good cause" that the jurors may have been exposed to extraneous information, the circuit court incorrectly required Grimes to show "good cause" that the information influenced the jury's verdict. The "good cause" that a defendant must show is that the jury may have considered extraneous information, not that the information influenced the jury's decision. If a defendant provides information that establishes "good cause" that the jury may have been presented with extraneous information, the court is to hold a hearing to determine if the jury did, in fact, consider extraneous information and what that information actually was. *Gladney*, 625 So. 2d at 418. In this case, the circuit court incorrectly applied the "good cause" requirements and should have convened a hearing on the issue.

¶36. Further, without determining the extent and nature of the allegedly extraneous material that was considered by the jury, the circuit court summarily ruled that no good cause existed to believe that the jury was influenced at all. The circuit court erred here in several ways. First, Grimes was not required to show there was "good cause" that the jury was influenced by the information. Grimes only needed to show "good cause" that the jury had considered extraneous information. Second, without even knowing what internet definitions the jury considered, the circuit court ruled that such definitions were within the common knowledge of the public. Third, Grimes was prejudiced by the circuit court's failure to convene a hearing on Grimes's allegations. Without such a hearing, Grimes could not present a full and complete record that would establish the materials the jury reviewed and, more importantly,

21

present evidence that could be used to assess if these materials were shared among all the jurors. In summary, we find that the circuit court abused its discretion by failing to conduct a hearing on Grimes's allegations of jury misconduct.

¶37. Even more serious is the circuit court's finding that the jury's research and discussion of the potential sentences that Grimes may be given was not improper extraneous information. The Mississippi Supreme Court has emphatically stated that a defendant's potential sentence is not a proper consideration for the jury. *See Marks v. State*, 532 So. 2d 976, 983-84 (Miss. 1988) ("[T]he jury should have no concern with the quantum of punishment to be imposed . . . . The question of punishment is categorically unrelated to [what] the verdict should be."). As noted in the dissent in *Roach*, 116 So. 3d at 136 (¶32) (Kitchens, J., dissenting), "the severity or leniency of a defendant's possible sentence is purposely withheld from juries exactly because of its considerable potential to influence their verdicts."

¶38. As we said in *Murry*, "[t]he State and Federal Constitutions guarantee . . . the right to a fair trial before an impartial jury." *Murry*, 218 So. 3d at 309 (¶25) (quoting *James v. State*, 912 So. 2d 940, 950 (¶17) (Miss. 2005)). In this case, Grimes presented sufficient evidence to establish "good cause" to warrant a hearing on the nature and extent of the extraneous information considered by the jury. By failing to convene a hearing to flesh out the specifics of the information, Grimes was denied the opportunity to show that the jury trying him was not impartial. Accordingly, we reverse the circuit court's summary denial of Grimes's motion for a new trial and remand the matter to the circuit court to convene a

22

hearing of jurors on the issue of juror misconduct. From the evidence presented at that hearing, the circuit court can then determine what information was considered and whether such information reasonably could have affected the jury's verdict.

## II. Whether the circuit court erred by giving the State's mutual combat instruction to the jury without any evidentiary basis.

¶39. Although we are remanding this case for proceedings on the issue of juror misconduct and whether Grimes may be entitled to a new trial, we also address Grimes's challenge to the "mutual combat manslaughter" instruction that was given to the jury. This instruction read:

> When two persons willingly engage in mutual combat, each with the intent to kill or do serious bodily injury to the other, and one or more of said persons does, in fact, kill the other, the homicide has generally been held to be manslaughter.

"Jury instructions are reviewed under an abuse-of-discretion standard. When read together, if the jury instructions state the law of the case and create no injustice, then no reversible error will be found." *Weaver v. State*, 265 So. 3d 182, 189 (¶25) (Miss. Ct. App. 2018) (citing *Burgess v. State*, 178 So. 3d 1266, 1272 (¶14) (Miss. 2015)).

### A. Evidentiary Basis

¶40. Grimes's first argument is that the instruction was improper because there was no factual basis in the record to support it. The State and the defense agree that the law is "well-settled that jury instructions are not given unless there is an evidentiary basis in the record for such." *Lewis v. State*, 295 So. 3d 521, 539 (¶56) (Miss. Ct. App. 2019) (quoting *Goodnite v. State*, 799 So. 2d 64, 69 (¶24) (Miss. 2001)). Surprisingly, on appeal, the State

23

now agrees that there were no facts in the record to support this instruction.[13] We too agree

and find that the circuit court erred in giving this instruction.

¶41.    We also note that the instruction itself was not a correct statement of the law. A trial

court should refuse a jury instruction that incorrectly states the law. *Dooley v. Byrd*, 64 So.

3d 951, 960, 962 (¶¶32, 39) (Miss. 2011). Although neither Grimes nor the State could

identify where this instruction originated, we note that in *Gamblin v. State*, 29 So. 764, 765

(Miss. 1901), the supreme court discussed a question that should have been submitted to the

jury to determine "whether the killing of the deceased was done upon malice, or upon heat

of passion engendered by a mutual combat wherein blows were passed." But the mention

of the term "mutual combat" was dicta, and did not appear in the instruction that was

discussed further in the opinion.

¶42.    The prosecutor in Grimes's case may have found the words it drafted into the mutual

combat manslaughter instruction from a statement this Court made in *Robinson v. State*, 773

So. 2d 943, 946 (¶8) (Miss. Ct. App. 2000). In that case, we discussed the sufficiency of the

evidence to support a jury's conviction of manslaughter in a case where the defendant had

been indicted for murder but claimed self-defense. We referenced a treatise on criminal law

and *partially* quoted it, stating:

> When two persons willingly engage in mutual combat, and during the fight one

---

[13] In its response to Grimes's JNOV motion, the State argued to the circuit court that there was some factual support for the instruction. But on appeal, the State abandoned this argument, stating in its brief, "Given these cases, there was no evidence to support the State's mutual combat instruction, and the trial court erred by giving it to the jury. There was no evidence that Grimes was expecting to encounter Seago or that he intended to fight him."

kills the other as the result of an intention to do so formed during the struggle, the homicide has long been held to be manslaughter. . . .

*Id.* (quoting Wayne R. LaFave et al., *Criminal Law* § 76, at 574 (1972)). But in that case, we were not dealing with a jury instruction on manslaughter, nor did we quote Lafave's paragraph in full, which now reads:

When two persons willingly engage in mutual combat, and during the fight one kills the other as a result of an intention to do so formed during the struggle, the homicide has long been held to be manslaughter, and not murder, the notion being that the suddenness of the occasion, rather than some provocation by the victim, mitigates the intentional killing to something less than murder. A study of this type of voluntary manslaughter concludes that cases of intentional kills in mutual combat are generally treated on the basis of provocation involved in batteries, the type of provocation discussed immediately above.

Wayne R. LaFave et al., Substantive Criminal Law, *Mutual Combat,* § 15.2(b)(2) (3d. ed. updated 2022). We did not intend this dictum from *Robinson* to be considered a full and adequate statement of the law on mutual combat manslaughter, and we must correct any such misconception should an attempt be made to use it as a jury instruction in the future.

### B. Harmless Error

¶43. Even though the State agrees that there was no evidentiary basis for the instruction it submitted, the State still argues that the error in giving the instruction in this manner was harmless.

¶44. The Mississippi Supreme Court has held that when an improper instruction was read together with other instructions presented to the jury, and the instructions together adequately informed the jury of the law, the error of the improper instruction is harmless. *Milano v. State*, 790 So. 2d 179, 184 (¶18) (Miss. 2001). Further, "[w]hen so read, if the instructions

25

fairly announce the law of the case and create no injustice, no reversible error will be found."

*Id.* at (¶14). In *Milano*, the defendant objected to a jury instruction that told the jury it could find him guilty if he willfully, unlawfully and feloniously did "any act which is an element" of capital murder/kidnapping with which he was charged. *Id.* at (¶16). However, three other instructions defined the elements of the crime. *Id.* Thus, the supreme court found any error to be harmless. *Id.* at 185 (¶22).

¶45.    In *Conley v. State*, 790 So. 2d 773, 793 (¶70) (Miss. 2001), when determining whether the failure to give the defendant's proposed instruction on the definition of culpable negligence was harmless error, the supreme court noted that although the defendant's instruction was better,

> [t]he error did not contribute to the verdict as the jury unanimously agreed that Conley murdered Whitney Berry while engaged in the crime of kidnapping. Error is harmless if it is clear beyond a reasonable doubt that it did not contribute to the verdict. *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). Therefore, although the trial court may have erred in refusing to grant Conley's manslaughter instruction containing an adequate definition of culpable negligence, it was harmless error.

¶46.    In this case, the erroneous mutual combat manslaughter instruction was not the only manslaughter instruction given. The jury was given two other instructions that identified the specific elements of manslaughter. In addition, the jury was instructed on Grimes's theories of sudden combat and self-defense. Accordingly, the error in giving the offending mutual combat manslaughter instruction was harmless error.

> III.    **Whether the trial court erred in prohibiting Grimes from introducing evidence of Seago's reputation in the community and specific acts of violence.**

26

¶47. Grimes next argues that the circuit court erroneously prohibited him from introducing evidence of Seago's prior physical fights, which he claims constituted a critical part of Grimes's self-defense argument. The State replies that there is no record of the circuit court's rationale for excluding such testimony because Grimes failed to have a bench conference concerning the State's objection made a part of the record, and thus Grimes is precluded from raising the issue on appeal.

¶48. Prior to trial, the State filed a motion in limine to exclude any evidence of Seago's prior history of fighting and violent behavior. The State's motion is not in the record, but Grimes's reply is. In it, Grimes pointed out that he sought to introduce evidence of Seago's reputation for violence to support his self-defense defense (i.e., Grimes acted reasonably in light of his fear of Seago and the danger that Seago posed, given his violent history). In his pleading, Grimes contended that years earlier, he and Seago's brother Chris S. were involved in a motor vehicle accident in which Chris S. died. Grimes claimed that because of this, Seago hated him. In addition, Grimes provided names in discovery of several individuals who had had fights with Seago in the past. Citing numerous cases as precedent, Grimes argued that he should be entitled to put this testimony into evidence.

¶49. At the April 5, 2021 argument on the State's motion, the State countered that there was no dispute that Seago was not the initial aggressor and that the State understood Seago's prior fights to have occurred five to seven years earlier and were thus too remote to be allowed into evidence. In response, Grimes argued that other undisputed facts— including but not limited to Seago's getting out of the truck first, Seago's gestures that at least one

27

witness as well as Grimes considered aggressive, Seago's calling out Grimes's name in a provocative manner, and Seago's weight advantage—created a question for the jury as to who the true aggressor was. Moreover, Seago's history and reputation validated Grimes's fear and the reasonableness of Grimes's actions. Grimes pointed out the Mississippi Rules of Evidence made a distinction between the admission of evidence of a defendant's character and the admission of evidence of the alleged victim's character. Under Rule 404(a)-(b), evidence of a defendant's character trait is not allowed unless the defendant makes it an issue; under Rule 404(a)(2)(B), a defendant may offer evidence of the alleged victim's pertinent trait. At the close of the arguments, the circuit judge stated:

> I think I'm just going to have to wait and hear what the testimony is going to be before I can rule on those. I don't think I'll be able to make a decision without that.

¶50. During the motions argument, the State had also sought permission to present evidence of prior fights Grimes had been in. The circuit court noted that Mississippi Rule of Evidence 404(a)-(b) precludes the admission of a defendant's character trait to say that they acted in conformity with that. However, the circuit court made no pre-trial ruling on the admission of evidence of Seago's reputation for violence or violent acts.

¶51. At trial, Kayla and Grimes's attorney had the following exchange:

> Q. Before that – before the night of April the 28 and early morning hours of April 29, had you known Greg to be in fights?
>
> A. I have.
>
> Q. Had you known him to fight a guy named Tyler Handlin?
>
> A. Yes, sir, in high school.

28

The State objected on the grounds of relevance. Grimes asked to approach the bench and there ensued an unrecorded off-the-record bench conference after which the trial judge sustained the objection, saying, "The objection is sustained. The jury is to disregard anything with regard to either the question or any particular answer at this point." Grimes did not seek the court's reasons for its ruling, nor did he make any proffer of what was discussed during the bench conference. Grimes asked no other witness any questions concerning Seago's reputation for violence or prior violent acts and called no witnesses to specifically testify about that.

¶52. In a similar situation, the Mississippi Supreme Court considered a defendant's failure to record a bench conference prior to the circuit court's ruling that she could not question a State witness, Burrow, about charges pending against her. *Scott v. State*, 796 So. 2d. 959, 962 (¶¶7-8) (Miss. 2001). In that case, the supreme court stated:

> The lack of evidence in the record that there were any pending indictments against Burrow, coupled with the fact that there is no record of the content of the bench conference contained in the record proves fatal for [the defendant] on this issue. Because the bench conference and arguments that occurred therein were not preserved on the record, review of the alleged error is waived in accordance with *Cotton v. State*, 675 So. 2d 308 (Miss. 1996); and *Edwards v. State*, 723 So. 2d 1221 (Miss. Ct. App. 1998). It is well established that objections must be made with specificity to preserve for appeal. *Oates v. State*, 421 So. 2d 1025, 1030 (Miss. 1982) (citing *Heard v. State*, 59 Miss. 545 (1882)).

*Id.* at 964 (¶16). Accordingly, the supreme court held that the trial court did not err in not allowing Scott to cross-examine Burrow about pending indictments against her. *Id*. at (¶17).

¶53. Similarly, in *Carey v. State*, 80 So. 3d. 131 (Miss. Ct. App. 2012), this Court held that the defendant was procedurally barred from arguing that he was improperly limited in his

29

cross-examination of a witness because he failed to preserve the error on the record. *Id*. at 134 (¶7). In that case, Carey shot and killed Phillip Charleston during a dice game. *Id*. at 133 (¶2). An eye-witness present, Marcus Smith, testified during the trial. *Id*. On cross-examination, Carey attempted to question Smith about Smith's purchasing alcohol for Carey and his brother, both of whom were minors. *Id*. at 133-34 (¶6). The State objected, and the court conferred with the parties at the bench. *Id*. at 134 (¶6). The bench conference was not transcribed and it appears that the court might have denied any further questioning because Carey abandoned any further questioning along those lines. *Id*. We noted that the record "contain[ed] no evidence of the arguments that were made during the bench conference, the circuit court's ruling, or any objection to the court's ruling." *Id*. On that record, we held that Carey was procedurally barred from raising the issue on appeal. *Id*. at (¶7). We cited *Scott* and *Brown v. State*, 965 So. 2d 1023, 1029 (¶24) (Miss. 2007), where the Mississippi Supreme Court held that it was the responsibility of the party complaining of an error to preserve the record for appeal. *Carey*, 80 So. 3d at 134 (¶7).

¶54. In the case at hand, although the parties argued the issue of the admissibility of evidence of Seago's reputation and prior acts of violence before trial, the court made no ruling at that time. At trial, when Grimes began questioning Kayla about Seago's past, the State objected on the grounds of relevance, and a bench conference ensued that was not recorded. As in *Carey* and *Scott*, Grimes failed to make a record of the argument on the objection or the basis for the court's ruling sustaining it. The State argues that like those other defendants, Grimes is procedurally barred from raising the issue now.

30

¶55. Grimes acknowledges that the record is missing this critical evidence. He states in his brief the trial court ruled that if Grimes introduced evidence of Seago's character, then the State would be allowed to introduce evidence of Grimes's character trait for violence as well. The State does not agree that this was the ruling of the court, and we have no basis to assess an unrecorded court ruling. Accordingly, we hold that Grimes is procedurally barred from arguing this issue.

## IV. Whether the trial court erroneously admitted Seago's autopsy report without redacting inadmissible hearsay.

¶56. Grimes next contends that the circuit court erroneously admitted Seago's final autopsy report, which he claims contained impermissible hearsay. In the initial Pathological Examination, prepared on and dated May 22, 2017, Chief Medical Examiner Dr. Mark LeVaughn made a "Provisional Pathological Diagnosis" of "blunt head injury of undetermined etiology." In the Final Pathological Examination dated August 14, 2017, Dr. LeVaughn listed the diagnoses as "multiple blunt head injuries due to beating." Grimes argues that Dr. LeVaughn only made this change because he was given additional information, which constituted hearsay, making the autopsy report inadmissible.

¶57. At trial, Dr. John Davis, who reviewed and signed the autopsy along with Dr. LeVaughn, testified to its findings, including the diagnosis:

> Q. All right. Under the first page where it says primary diagnosis. It says that he died from multiple blunt head injuries due to beating. How did y'all discover -- how did y'all decide that?
>
> A. Through investigative information as well as review of medical records.
>
> Q. And what led -- I guess what medical records or what medical

31

> information led you to characterize it as a beating?
>
> A.    Actually, my boss, he's the one who characterized it as a beating. I would have worded it differently. But all throughout the medical records it references an assault by another person.
>
> Q.    All right. How would you have referenced it?
>
> A.    I would have put as far as cause of death multiple blunt force injuries and under how it occurred I would have put assaulted by others.

Dr. Davis further testified about three points of impact on Seago's head: one on the back, another on his face, and another on the right side of his head. He said that he had no doubt that Seago "died from his blunt force injuries from the assault." Grimes did not object to any of this testimony.

¶58.    After Davis identified the autopsy report and the State moved to have it admitted. Grimes's attorney asked to approach the bench. Off the record, the parties conferred and thereafter the court admitted the report into evidence. Again, we have no record of the basis for Grimes's objection or the rationale of the court's decision to admit the report. Grimes made no request on the record to have the report redacted in any way, as he now argues. Because Grimes's objection was not preserved, we find his argument on this issue is procedurally barred. *Scott*, 796 So. 2d at 964 (¶16).

**V.    Whether the trial court erroneously allowed Dr. Davis to testify when his opinions were not given to a reasonable degree of medical certainty.**

¶59.    Grimes next argues that the circuit court erred in not striking Dr. Davis's testimony which he claims was not given to a reasonable degree of medical certainty. However, Grimes did not object on this basis to any testimony Dr. Davis gave, either on direct or on

32

cross-examination. In his cross-examination, Grimes even posed hypotheticals[14] and solicited opinions[15] from Davis himself. (The jury heard Dr. Davis and his opinions in full. It was only after both the State and the defense rested that, as an adjunct to his renewed motion for directed verdict, Grimes moved to exclude Dr. Davis's testimony on this basis.) Again, Grimes's objection was untimely, and we have no obligation to review his assignment of error. In *Dorrough v. Wilkes*, 817 So. 2d 567, 577 (¶33) (Miss. 2002), the Mississippi Supreme Court held:

> An appellate court is under no obligation to review an assignment of error when an objection was not made or when an objection was untimely. *Carr v. State*, 655 So. 2d 824, 832 (Miss. 1995). The contemporaneous objection rule is in place to enable the trial court to correct an error with proper instructions to the jury whenever possible. *Gray v. State*, 487 So. 2d 1304, 1312 (Miss. 1986) (citing *Baker v. State*, 327 So. 2d 288, 292-93 (Miss. 1976)). Accordingly, this issue is procedurally barred.

In Grimes's case, no contemporaneous objection was raised that Dr. Davis's opinions had not been established with certainty at the time Dr. Davis testified. To raise it after both sides had rested and the circuit court was about to instruct the jury is untimely. Accordingly, we find that Grimes waived this argument.

---

[14] Q. Okay. If an individual comes in with a gunshot wound to the chest or the body typically would what you think that the manner of death was in this case?
   A. It would depend upon the appearance of the gunshot wound, how far away the muzzle of the gun was, and whether a gun was found at the scene.

[15] Q. Right. So that was the narrative summary that was provided in this autopsy report authored by Dr. LeVaughn and signed off on by you. It sounds to me that -- you know, he's hit in the head, or he and hit his head, you would agree with me that the fall and his head banging on the concrete would have been substantial in producing an injury to him, correct?
   A. A fall from a height can, yes.

**VI.    Whether the trial court erroneously excluded the results of chemicals found in Seago's blood.**

¶60.    Grimes contends that the circuit court erred when it excluded Seago's pathology report that showed Seago's blood tested positive for amphetamines and Oxycodone. Grimes made a proffer that this evidence should have been admitted and that it was relevant and not, as the circuit court ruled, prejudicial. But in his brief Grimes fails to cite any authority to support his argument.

¶61.    We have no obligation to address an issue when a party fails to cite relevant authority. *Williams v. State*, 336 So. 3d 1068, 1076 (¶38) (Miss. 2022) (citing *Simmons v. State*, 805 So. 2d 452, 487 (¶90) (Miss. 2001) ("Failure to cite relevant authority obviates the appellate court's obligation to review such issues.")). In *Wackenhut Corp. v. Fortune*, 87 So. 3d 1083, 1094 (¶35) (Miss. Ct. App. 2012), we held:

> "Arguments advanced on appeal must contain the contentions of the Appellant with respect to the issues presented and the reasons for those contentions *with citations to the authority*, statutes, and parts of the record relied on." M.R.A.P. 28(a)(6). Failure to cite authority to support an argument renders an issue procedurally barred. *Read v. S. Pine Elec. Power Ass'n*, 515 So. 2d 916, 921 (Miss. 1987) (citations omitted).

(Emphasis added). Because Grimes cites no authority to support his argument concerning the admission of Seago's toxicology results, the issue is procedurally barred and we will not consider it on appeal.

**VII.    Whether the circuit court erroneously allowed testimony from Dr. Draper on re-direct.**

¶62.    Finally, Grimes argues that the circuit court allowed the State to question Dr. Draper on re-direct concerning matters not brought up during cross-examination. We need not

discuss this alleged error much because, again, Grimes's attorney did not contemporaneously object to the State's re-direct examination of Dr. Draper, other than telling the court at the end of the re-direct that he had no further questions "only other than that, you know, a standing objection to all that (referring to Dr. Draper's testimony)." He gave no basis for his objections. Then, after the jury was excused for a proffer, Grimes said he objected to the State's redirecting Dr. Draper on injuries Seago suffered to his tongue, face, and head because the doctor had not been questioned on these injuries on cross-examination. The State replied that in his cross-examination, Grimes questioned Dr. Draper about whether Seago's injuries had been caused by Seago's own intoxication. Thus, the State said its questions on re-direct were intended to counter that point. The circuit court overruled Grimes's objection and pointed out that it had allowed Grimes to re-cross if Grimes desired.

¶63.    Even if Grimes has not waived the issue on appeal by failing to make a timely objection to the State's re-direct of Dr. Draper, we find no error in the circuit court's handling of Grimes's untimely objection. "The scope of redirect examination, while largely within the discretion of the trial court, is limited to matters brought out during cross-examination. However, we will not disturb a trial court's ruling on matters pertaining to redirect examination unless there has been a clear abuse of discretion." *McDonald v. Lemon-Mohler Ins. Agency LLC*, 183 So. 3d 118, 133 (¶52) (Miss. Ct. App. 2015) (citing *Thompson v. State*, 157 So. 3d 844, 854 (¶33) (Miss. Ct. App. 2015)). In that case, the trial court did not prevent "the McDonalds from testing the accuracy and veracity of the witness's testimony," and there was no prejudice. *Id*. at (¶57). In this case, our review of the record

35

shows that the State gave a rational explanation for its re-direct and the circuit court afforded Grimes further re-cross if he desired. Accordingly, we find no abuse of discretion by the circuit court and no merit to this issue on appeal.

**Conclusion**

¶64. Because Grimes made a good-cause showing of juror misconduct, the circuit court erred in summarily denying Grimes's request for a new trial without holding an investigative hearing. The circuit court's ruling on this issue is reversed, and the matter is remanded for the circuit court to convene a hearing of the jurors, determine the specific materials the jurors reviewed during their independent internet search of legal terms and sentences, and make the appropriate finding as to whether this information reasonably could have affected the jury's verdict. If the court determines that the jury's verdict was influenced by extraneous information, notwithstanding the other evidence the jury may have concluded pointed to Grimes's guilt, then the circuit court shall grant Grimes a new trial. On the other hand, if the court determines that no extraneous matter was discussed or that the discussion of such matter did not influence the jury's verdict, it shall make on-the-record findings and enter a final order disposing of the request for a new trial.

¶65. We further find that the mutual combat manslaughter instruction was erroneous; however, the error in this case was harmless. Among procedural bars, we find no merit to the remaining issues Grimes raises on appeal.

¶66. **REVERSED AND REMANDED.**

   **BARNES, C.J., CARLTON AND WILSON, PJJ., GREENLEE, WESTBROOKS, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ.,**

36

**CONCUR.**