# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-KA-01384-COA

**JAMIEN WASHINGTON A/K/A JAMAIEN WASHINGTON**                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                   **APPELLEE**

DATE OF JUDGMENT:               11/05/2021
TRIAL JUDGE:                    HON. DEBRA W. BLACKWELL
COURT FROM WHICH APPEALED:      ADAMS COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:         ROBERT B. McDUFF
ATTORNEY FOR APPELLEE:          OFFICE OF THE ATTORNEY GENERAL
                                BY: ALEXANDRA LEBRON
DISTRICT ATTORNEY:              SHAMECA SHANTE' COLLINS
NATURE OF THE CASE:             CRIMINAL - FELONY
DISPOSITION:                    AFFIRMED - 08/29/2023
MOTION FOR REHEARING FILED:

**BEFORE BARNES, C.J., LAWRENCE AND EMFINGER, JJ.**

**BARNES, C.J., FOR THE COURT:**

¶1.     A jury convicted Jamien Washington of the first-degree murder of Lewis Jackson III, the aggravated assaults of Alisha Mason and Joshua Beamer by shooting, and the drive-by shooting of Jackson. The trial court sentenced Washington to the mandatory sentence of life imprisonment for first-degree murder by deliberate design, twenty years for each count of aggravated assault, and thirty years for the drive-by shooting, with the sentences to be served concurrently in the custody of the Mississippi Department of Corrections. The trial court imposed mandatory five-year firearm enhancements to each of the aggravated assault and drive-by shooting sentences, which were set to run consecutively.

¶2.     On appeal, Washington claims the trial court erred in denying his *Batson*[1] challenge during jury selection and improperly allowing the State's peremptory challenges, which allegedly resulted in a racially imbalanced jury and an unconstitutional trial. We find no error and affirm.

## STATEMENT OF THE FACTS

### *The Shootings*

¶3.     During the early morning hours of September 22, 2018, in Natchez, Mississippi, Washington was "hanging out" with Darnell Stevenson and Darryl Hurts,[2] who recently had been released from prison.[3] Washington was taking Xanax and drinking liquor. The co-defendants rode around town in Washington's gold SUV, ultimately heading to the Holiday Apartments. Law enforcement testified that there was an ongoing and often violent conflict between individuals in the Holiday Apartments and the adjacent Maryland Heights neighborhood. In fact, the week before, Stevenson had been shot at while in Maryland

---

[1] In *Batson v. Kentucky*, 476 U.S. 79, 89 (1986), "the United States Supreme Court held that parties could not exercise peremptory strikes based solely on a potential juror's race." *Eubanks v. State*, 291 So. 3d 309, 319 (¶30) (Miss. 2020).

[2] Stevenson and Hurts were also charged regarding this shooting but were indicted and tried separately. Hurts testified against both Stevenson and Washington at their respective trials. The week before Washington's trial, an Adams County jury convicted Stevenson of second-degree murder, two counts of aggravated assault, and one count of a drive-by shooting, and this Court affirmed his conviction in *Stevenson v. State*, No. 2021-KA-1286-COA, 2023 WL 4194128, at *1 (¶1) (Miss. Ct. App. June 27, 2023). At the time of Washington's trial, Hurts had pleaded guilty to conspiracy to commit second-degree murder but testified that he had not yet been sentenced.

[3] At trial, Hurts testified that in 2017 he had pleaded guilty to conspiracy to commit armed robbery, which had been reduced from armed robbery. Hurts testified that he served three years of that five-year sentence.

Heights, and that shooting resulted in the death of another individual. Law enforcement suspected that the shooter was Jamari Lucas, a.k.a. "Jay Luc," who lived in the Holiday Apartments. At approximately 2:00 a.m., the co-defendants made a couple of loops around the apartments in Washington's SUV looking for "Jay Luc."

¶4. During the second loop, they started firing at a person near a white pick-up truck after Washington exclaimed, "There he go!" The person was not "Jay Luc" but, instead, Jackson. Two firearms were used in the shooting—a .40-caliber handgun and military-style assault rifle. The white truck became riddled with bullet holes. Jackson sustained a serious wound to his back. The assault rifle bullets penetrated the apartment walls into Beamer and Mason's bedroom. Numerous bullets perforated their apartment's doors and furniture. Beamer sustained a deep gunshot wound to his shoulder, and Mason suffered a gunshot wound to her buttocks. Jackson, Beamer, and Mason were taken to the hospital by ambulance, where Jackson died from the gunshot wound to his back.

¶5. A Natchez law enforcement investigator witnessed the shooting. Commander Scott Frye responded to a call about a gold SUV possibly involved in another shooting at the Holiday Apartments. Commander Frye located a gold SUV, later identified as belonging to Washington, and followed it to the Holiday Apartments when the shooting began. He testified to seeing flashes of light from the driver's side window and recognizing the sound of a military, "AR-type" rifle. Commander Frye believed they were shooting at him, not the pick-up. He retreated in his vehicle and drove to a side street until backup arrived. When other officers arrived, Jackson was found lying on the ground. Commander Frye could not

3

identify the shooters. Numerous assault rifle shell casings and four .40-caliber shell casings were recovered from the ground.

¶6. Testimony conflicted on whether Washington or Hurts was driving the SUV and who was shooting. Hurts testified that he, Washington, and Stevenson went to the Holiday Apartments to shoot "Jay Luc" in retribution for the shooting in Stevenson's neighborhood a week earlier. Hurts testified that Stevenson said he wanted "to see something drop," meaning "somebody need to get shot." Hurts testified that Washington was driving the SUV. During the second loop, Washington exclaimed, "There he go!" According to Hurts, Stevenson let down the back window and started firing the assault rifle while Washington fired the handgun from the driver's window. Shots were returned from an unknown source. Hurts testified that he did no shooting but sat on the front passenger side, ducking.

¶7. In contrast, Washington testified that he never held or fired a gun during the shooting. When he picked up Hurts and Stevenson that evening, Hurts had the assault rifle, and Stevenson had the .40-caliber handgun. Washington testified that they had no plans. Later in the evening, Hurts started driving the SUV because earlier Washington had fallen out of his vehicle at a convenience store due to taking Xanax and drinking liquor.

¶8. Washington testified that during the shooting, he was passed out in the passenger seat and did not know where he was; he awoke to gunshots and bullets entering his SUV. Washington testified that Hurts was shooting the assault rifle from the driver's seat, and Stevenson was shooting the handgun from the rear seat. Washington claimed that he did not know whom they were shooting at or why. During cross-examination, Washington admitted

4

that he gave several different versions of the shooting to police during his numerous interviews (which were heard by the jury), and they all differed from his account at trial. Washington testified that he lied because he was scared; he had no criminal record and had fallen in with the "wrong crowd," namely Hurts and Stevenson.

### *Voir Dire*

¶9.     The Adams County venire consisted of thirty-six individuals—twenty-two were white and fourteen were black. The trial court deemed this ratio to be a "fair mix of the community."

¶10.    During voir dire, the prosecutor gave a hypothetical to the venire of accomplice liability.[4] The prosecutor also informed the venire that co-defendant Hurts, who had already pleaded guilty, would testify against Washington. Potential Juror 2, Mr. Thomas, a black male, was questioned by the prosecutor about Thomas's following the law on accomplice liability and Hurts's testimony.

¶11.    The discussion began with the prosecutor's explaining accomplice liability to the venire:

---

[4] On appeal, Washington claims the hypothetical was incorrect and irrelevant because Washington was not charged with felony murder; instead, he was charged with first-degree (deliberate-design) murder. Washington contends that the State accused him of being one of the shooters and offered a jury instruction that the accomplice must share the intent of the principal "to bring about the crime." In contrast, the hypothetical involved a driver who had no knowledge her companion was going to shoot someone. The hypothetical appears to be a combination of accessory before the fact, indictment as a principal (*see* Miss. Code Ann. § 97-1-3 (Rev. 2020)), and the felony murder doctrine (*see* Miss. Code Ann. § 97-3-27 (Rev. 2020)). Nonetheless, Washington concludes that the hypothetical is not a part of his *Batson* challenge. It does, however, give the background for the upcoming exchange between the prosecutor and Juror 2.

5

[Hurts] is going to testify against Mr. Washington because they were all indicted, and they are considered accomplices. In Mississippi the law is if you take part in any crime, any part of a crime, you are responsible for the whole crime. Let me give you an example. If me and Barbara decide to go and steal some liquor from the liquor store, Barbara is going to drive the getaway car. I'm going to go in and stick the liquor in my jacket and run off . . . that's what she and I agreed on. So I run to the store, I grab a fifth of gin, stick it in my jacket. The shopkeeper says, hey, what are you doing. I pull out a pistol and shoot the shopkeeper. Now it's murder, and I run out and get in the car and Barbara says what was that gunshot. You were just supposed to go steal a bottle of liquor. The law in Mississippi is if you agree to commit any crime, you are responsible for any crime that results as a result of that crime.

The prosecutor asked, "Do you all agree to follow that law even if you don't agree with it?"

The prosecutor then continued discussing co-defendant Hurts's testifying for the State:

Hurts will be testifying in this case. Darryl Hurts is . . . what some people might call a snitch. Do any of you feel like if someone is snitching or ratting out his buddy, ain't no way I can believe nothing he says. Nothing, no matter how much -- no matter how convincing he is, you just ain't going to believe him because he's ratting out his buddy. Do any of you feel that way?

(No response.)

BY [PROSECUTOR]: Will you give me your word that you will listen to him and consider his testimony just like every other witness?[5] Will you give me your word on that?

(Jurors nod heads.)

¶12. Next, the prosecutor spoke with potential Juror 2 (Thomas), and the following

---

[5] The prosecutor gave the wrong standard to the venire on accomplice testimony when he asked if they could "consider his testimony just like every other witness." Washington points out that accomplice testimony should not be considered "just like every other witness" but, instead, "with great caution and suspicion." However, that is true only when the accomplice testimony is uncorroborated. *Catchings v. State*, 394 So. 2d 869, 870 (Miss. 1981) (citing *Moore v. State*, 291 So. 2d 187, 189 (Miss. 1974)). Further, it is for the jury to decide how much weight to give the testimony of each witness. *Jones v. State*, 203 So. 3d 600, 607 (¶16) (Miss. 2016) (quoting *Osborne v. State*, 54 So. 3d 841, 846 (¶21) (Miss. 2011)).

discussion ensued:

> BY [PROSECUTOR]: What about you, number two? You're looking at me like I don't know about that. Tell me how you feel about that.
>
> BY JUROR [2]: *I am just a little mixed. That's all.*[6]
>
> BY [PROSECUTOR]: What do you mean by mixed? What are you mixed about?
>
> BY JUROR [2]: When you give the description of the shooting.
>
> BY [PROSECUTOR]: Right. That's just an example of the accomplice.
>
> BY JUROR [2]: Well, even still, *I just don't think that's fair.*
>
> BY [PROSECUTOR]: Okay.
>
> BY JUROR [2]: *And secondly the whole telling portion, I just feel weird. That's all.*
>
> BY [PROSECUTOR]: And I understand about the description and all, and you just don't agree with it. Are you telling me that -- and everybody has their convictions and beliefs. Remember I said that earlier --
>
> BY JUROR [2]: Right, right.
>
> BY [PROSECUTOR]: -- morals and stuff. Are you telling me that your convictions and beliefs are so strong that you could not follow that law if given to you by the Court.
>
> BY JUROR [2]: *Not that I wouldn't follow it, but I wouldn't agree to it.*
>
> BY [PROSECUTOR]: *You wouldn't agree with it.*
>
> BY JUROR [2]: *No, sir.*
>
> BY [PROSECUTOR]: So you wouldn't have a problem doing something you don't agree with?

---

[6] All uses of italics in quoting from the transcript are added by the Court of Appeals.

BY JUROR [2]: What do you mean?

BY [PROSECUTOR]: Well, you say you wouldn't agree with it –

BY JUROR [2]: I would –

BY [PROSECUTOR]: -- but you would follow it.

BY JUROR [2]: *I am saying follow it. I mean, I would hear it out* –

BY [PROSECUTOR]: Right.

BY JUROR [2]: *But I don't think it's fair if she didn't know you were going to shoot the guy* –

BY [PROSECUTOR]: Right.

BY JUROR [2]: -- for her to get the same crime that you -- the same --

BY [PROSECUTOR]: Right.

BY JUROR [2]: -- as you. *I don't think that's fair.*

BY [PROSECUTOR]: Okay.

BY JUROR [2]: *And so that's where I was like on the fence,* and if she goes to talking about you, she had no idea you would even shoot the person.

BY [PROSECUTOR]: Well, if she snitched on me –

BY JUROR [2]: Well –

BY [PROSECUTOR]: -- would you believe her –

BY JUROR [2]: -- if she knew that you had the pistol on you and you're going to shoot somebody, that's not snitching to me. Snitching is when we sat down and we done had a conversation about what we were about to do, and then I turn around and tell because I don't want -- even though I didn't pull the trigger, I knew you would pull the trigger. *That's a snitch, and I ain't got no problem with hearing that part of it.* I didn't know and then I get the same penalty that you get, I don't think that's fair, and I don't think I could be really a hundred percent like okay. That's a good deal. I am not a fan of that.

8

BY [PROSECUTOR]: Okay.  Thank you, sir.

BY JUROR [2]: That's all I am saying.

¶13.    When the prosecutor asked the other potential jurors, "Does anyone else feel the same way as this juror?" six other black potential jurors (Jurors 3, 4, 6, 10, 23, and 27)[7] raised their cards indicating agreement with Thomas.  The prosecutor did not ask them any follow-up questions.

### *Jury Selection*

¶14.    Ultimately, the petit jury was composed of ten white jurors and two black jurors.  The State challenged for cause Juror 2 (Thomas) because he "had a hesitance and said he would have a disagreement and a problem with following the law as given to him by the Court."  Defense counsel objected, pointing out, "I did not see it as a hesitancy. . . .  Everybody said they would follow the law.  At the end of the voir dire, Mr. Thomas said that. . . . That's not what I remember his saying."  The trial judge denied the State's challenge for cause of Juror 2, stating, "My notes reflect that he said that he had a mixed opinion about an accomplice and a snitch, and he wouldn't agree with it, but I don't believe that's reason to strike him for cause."

¶15.    The parties each had twelve peremptory challenges for the selection of twelve jurors because Washington's punishment would be life imprisonment if he were convicted of first-degree murder.  *See* MRCrP 18.3(c)(1)(A)(i).  The State exercised a total of ten challenges, using nine to strike black venire members.  Seven of the nine peremptory strikes against

---

[7] Going forward, we refer to a potential juror as "Juror" for readability.

black people are at issue in this appeal, and they include Juror 2 (Thomas) and the six other venire members who agreed with his answers during voir dire (Jurors 3, 4, 6, 10, 23, and 27).

¶16.　The peremptory challenges began after the State tendered a panel of twelve potential jurors and used nine peremptory strikes (eight against black people). Defense counsel objected under *Batson*, and the trial court requested the prosecutor give race-neutral reasons for the strikes against black venire members.

¶17.　The following colloquy occurred as to the State's peremptory strikes S-2 through S-7:

BY THE COURT: Juror number two.

BY [PROSECUTOR]: Mr. Thomas, Your Honor, as I said earlier, *Mr. Thomas was conflicted with following the law.*

BY THE COURT: The Court will accept that as a race neutral reason. *He said he was -- had a mixed opinion as to the position of an accomplice and a snitch, and he would not agree with it*, and so for those reasons, the Court finds that it's a race neutral reason. Juror number three.

BY [PROSECUTOR]: Mr. Jackson [Juror 3], when I asked does anyone else feel the same way that Mr. Thomas did, Mr. Jackson raised his card.

BY THE COURT: Yes. He did. The Court finds that is a race neutral reason also. He responded as to the accomplice and the snitch question. Juror number four.

BY [PROSECUTOR]: Same thing. Mr. Oliver [Juror 4] raised his card as well on that question.

BY THE COURT: And the Court finds that that's a race neutral reason. Let the record show that S-5 was a white female [Juror 5, Ms. Dill]. Any comment about that, Mr. Dowdy?

BY [DEFENSE COUNSEL]: No ma'am.

BY THE COURT: S-6.

BY [PROSECUTOR]: Mr. King [Juror 6] raised his card as well in agreement with Mr. Thomas.

BY THE COURT: Yes. He responded as to the accomplice and the snitch question, and the Court finds that is a race neutral reason. Juror number ten [Logan] which was S-7.

BY [PROSECUTOR]: Ms. Logan also raised her card in agreement with Mr. Thomas.

BY THE COURT: Yes. She did answer that question. The court finds that that is a race neutral reason.

¶18. The defense was then presented with a panel of twelve potential jurors and moved to strike eight potential jurors (the ninth strike occurred later). The State made a reverse *Batson* challenge because all defense counsel's strikes were against white people. The State pointed out that none of the stricken jurors had made any statements during voir dire as a basis for the strikes, and defense counsel made the strikes before he had seen the information on the juror cards; therefore, his strikes had to be based on race or gender. The trial court asked defense counsel for his race-neutral reason for striking Juror 8 (Anderson) (D-1), a white person. Defense counsel answered that he did not like the way she "appeared to respond to the prosecution's voir dire" and admitted that due to the State's exercise of its peremptory challenges, it would not be "fair" for his client to be tried by "a heavily white jury."

¶19. The trial court allowed the strike because Juror 8's "response appeared to be more in favor of the State." However, the trial court rejected defense counsel's second through fifth strikes because the defense failed to state a race-neutral reason. Those individuals became

jurors.

¶20. The trial court asked the State to tender four more potential jurors. The State accepted Juror 22, a white person, and then used its ninth peremptory strike against Juror 23 (Lewis), a black person. The prosecutor explained his race-neutral reason for the strike was because "Lewis raised his card in agreement with Mr. Thomas." The defense counsel then asked the trial judge, "Is that on the record anywhere Judge?" She responded:

> Yes, it is. *Mr. Lewis raised his card and said he had a problem because we had an accomplice in this case* [*who*] *would be testifying against the defendant and because of the snitch issue.* Mr. Hurts snitching on Mr. Washington. And so for those reasons, the Court finds that this is [a] race neutral reason, and the Court is going to allow that challenge.

The defense then exercised its ninth peremptory strike on Juror 22 (Martin), a white person. The following exchange occurred among the trial judge, defense counsel, and the prosecutor:

> BY THE COURT: And I'm assuming that's going to be because of her race. She is white.
>
> BY [DEFENSE COUNSEL]: No, ma'am. That is an effort by me to have racial balance in a jury where an African-American is on trial, and they -- *the State is citing as reasons for their peremptory people that have held up their hands in response to some question not born out in the record*, and, again, I feel that I have got to in order to protect my client in this case [and] make it a racially balanced jury.
>
> BY [PROSECUTOR]: Your Honor, counsel opposite is admitting to violating the law and striking people because of their race. He just admitted that he struck a juror because of their race. That's improper. He didn't even attempt to give a race neutral reason.
>
> BY THE COURT: And Ms. Martin was one of the ones that did not respond to any questions, and I will reiterate for the record that the strikes that were made by the State were all because those people said they had a problem with

12

an accomplice and a snitch being a witness in this case, and that is a race neutral reason, and the Court is going to accept Ms. Martin.

¶21.  The defense exercised its tenth peremptory strike on Juror 24 (Kaiser), a white person, giving the reason that

> *when a juror raised his hand and said he would have a problem with a snitch testifying*, she did not raise her hand.  In other words, *she is willing to accept the testimony of a so-called snitch*, and I object and wish to use my peremptory for that reason.  She did not raise an objection to a snitch being allowed to testify in this case, and that *she indicated that she had no problem with that.*

The prosecutor agreed that was a race-neutral reason and did not object to the strike, which the trial court granted.[8]

¶22.  The prosecutor then used his tenth (and last) peremptory strike on Juror 27 (Hughes), a black person, because he raised his card in agreement with Juror 2 and because a family member was a victim of a violent crime.

> BY [PROSECUTOR]: The State would exercise S-10 on Mr. Hughes, and the reason for Mr. Hughes, he was one that raised his card and said he agreed with number two.  *That he couldn't follow the law.*  Didn't agree with the law –
>
> BY [DEFENSE COUNSEL]: Judge, now, he -- (pause)
>
> BY THE COURT: And he was a black male.

---

[8]  The defense exercised its next strike (D-11) on Juror 26 (Lerch), whose race was unknown from the record.  The defense gave the same reason as the one for Kaiser's strike—Lerch did not raise his hand, indicating he had no problem with a snitch testifying.  The State argued this explanation was pretextual because the question was "whether they could follow the law on accomplice testimony."  Contrary to what the court had held with respect to Kaiser, the trial court found the defense's reason was not race-neutral, and Lerch was accepted as a juror.  The trial court may have accepted the State's argument that the strike was pretextual—in line with the defense's previous attempts to strike white jurors in order to have a more racially balanced jury.  In any event, Washington has not challenged the trial court's ruling regarding Juror 26 on appeal.

BY [PROSECUTOR]: Yes, ma'am.

BY THE COURT: Mr. Dowdy?

BY [DEFENSE COUNSEL]: Number one, I do not remember him saying that he would not follow the law. *I do not remember any of these jurors, these African-American jurors who have been excluded from this jury panel saying that.*

BY [PROSECUTOR]: He also –

BY [DEFENSE COUNSEL]: *At the end, juror number two said he could follow the law as I remember.*

BY [PROSECUTOR]: Your Honor, the State has to give a race neutral reason. The fact that number two had -- and we've already done number two for that matter. *Number two says he was conflicted. He had a problem. He didn't agree with that.* That is a race neutral reason. Number twenty-seven agreed -- when I asked did anyone else agree or feel the same way as number two, number twenty-seven was one of those that raised his cards.

BY [DEFENSE COUNSEL]: And I do not remember the Court taking down or noting the ones that raised their cards.

BY [PROSECUTOR]: Additionally Mr. Hughes also said he had a family member that was murdered, *but the main reason the State seeks to exercise a peremptory challenge on him was because of his problem with following the law.*

BY [DEFENSE COUNSEL]: He did not indicate that he -- any of these people that they have challenged. The only reason they have challenged them, Judge, is because they're black people. All of their challenges except one; isn't that right? Have been successfully challenged because of their race.

BY THE COURT: All of their challenges have been -- all of these people said that they did not agree with an accomplice and mostly a snitch, and, therefore, they have a problem with it, and that is a race neutral reason, Mr. Dowdy, and so for that reason, the Court is going to let the State exercise its challenge. That will be S-10. That is a race neutral reason.

The trial court denied the defense's twelfth strike and accepted Juror 28 as the twelfth juror,

14

stating to defense counsel:

> BY THE COURT: -- it appears that you are excluding everyone because they happen to be Caucasian, and the panel started out with an even mix of Caucasians and African-Americans, and that's what we're required to do. You have not given a race neutral reason. [Juror 28] didn't even respond to any question. So the Court is going to allow that. So now we have a panel of twelve.

## STANDARD OF REVIEW

¶23. The appellate court's standard of review for the circuit court's findings under *Batson*

is highly deferential:

> We give great deference to the trial court's findings of whether or not a peremptory challenge was race neutral. Such deference is necessary because finding that a striking party engaged in discrimination is largely a factual finding and thus should be accorded appropriate deference on appeal. Indeed, we will not overrule a trial court on a *Batson* ruling unless the record indicates that the ruling was clearly erroneous or against the overwhelming weight of the evidence.

*Thorson v. State*, 721 So. 2d 590, 593 (¶4) (Miss. 1998) (citations omitted).

## ANALYSIS

¶24. Washington's sole argument on appeal is that the State made racially discriminatory

use of peremptory challenges in violation of *Batson* in seven of nine strikes against potential

jurors. Washington contends the State "mischaracterized the record and made false claims

about what Juror Number 2 said." Additionally, Washington claims the prosecutor asked

an ambiguous question about whether the other venire members "felt the same way" and

failed to follow up with other questions about their concerns, suggesting the State's race-

neutral reasons were a "fabricated pretext" for discrimination. Moreover, Washington

argues that the trial judge improperly gave "her own version of the prosecution's reasoning

15

which also mischaracterized the record" and "augmented" the State's false reasons. Washington further contends the trial court erred in failing to conduct the last step of the *Batson* analysis on pretext. We shall address Washington's arguments within the framework of the *Batson* three-step process.

## *BATSON* ANALYSIS

¶25. "To safeguard against racial discrimination in jury selection, the United States Supreme Court in *Batson* established a three-step process." *H.A.S. Elec. Contractors Inc. v. Hemphill Const. Co.*, 232 So. 3d 117, 123 (¶14) (Miss. 2016) (citing *Pitchford v. State*, 45 So. 3d 216, 224 (¶13) (Miss. 2010)). First, the party objecting to the peremptory strike has to make a prima facie case that race was the reason for the strike. *Id.* The "pivotal inquiry" of this step is whether "the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Randall v. State*, 716 So. 2d 584, 587 (¶11) (Miss. 1998) (quoting *Batson*, 476 U.S. at 94).

¶26. "Second, if the objecting party makes such a showing, the burden shifts to the striking party to state a race-neutral reason for the strike." *H.A.S.*, 232 So. 3d at 123 (¶14). "The sole inquiry under step two is whether the explanations given are facially violative of equal protection." *Puckett v. State*, 788 So. 2d 752, 760 (¶17) (Miss. 2001). The explanation does not need to be "persuasive, or even plausible." *Purkett v. Elem*, 514 U.S. 765, 768 (1995). "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id.* (citing *Hernandez v. New York*, 500 U.S. 352, 360 (1991)).

16

¶27. Third, after the striking party offers its race-neutral explanation, the court must determine if the objecting party met its burden to prove purposeful discrimination in the exercise of the peremptory strike—that the stated reason for the strike was merely a pretext for discrimination. *H.A.S.*, 232 So. 3d at 123 (¶14). The relevant inquiry for this step "is not whether the State disproves pretext; rather, it is whether the opponent of the strike has met its burden of proving pretext." *Jones v. State*, 252 So. 3d 574, 583-84 (¶38) (Miss. 2018).

¶28. At the outset, we note that Washington stressed the fact that his jury was composed of ten white people and two black people in a county that is fifty-four percent black (according to Washington). However, the Mississippi Supreme Court has consistently held that

> [t]he *Batson* doctrine is not concerned with racial, gender, or ethnic balance on petit juries, and it does not hold that a party is entitled to a jury composed of or including members of [a] cognizable group. Rather, *it is concerned exclusively with discriminatory intent* on the part of the lawyer against whose use of his peremptory strikes the objection is interposed.

*H.A.S.*, 232 So. 3d at 133 (¶8) (emphasis added) (quoting *Strickland v. State*, 980 So. 2d 908, 915 (¶10) (Miss. 2008)).

### I.   Step One: Prima Facie Case

¶29. We begin with the State's claim that Washington failed to make a prima facie showing under the first step of *Batson* that race was the reason for the strikes. The defense objected under *Batson* when the State first tendered twelve potential jurors after using eight of its nine peremptory challenges. The State claims that Washington only objected to the

17

State's challenges because eight of the State's nine total challenges were against blacks, and that factor "standing alone," failed to establish "an inference of discriminatory purpose." The State cites *Wolfe v. State*, 237 So. 3d 848, 851 (¶8) (Miss. Ct. App. 2017), that "[t]he use of peremptory strikes on a majority of potential jurors of a particular race or gender does not, standing alone establish a prima facie case of discrimination." The State concludes that because Washington only objected because the State's strikes were of blacks, he failed to make a prima facie case showing race was the criterion for the strike. We disagree with the State on this point.

¶30.    To establish a prima facie case under *Batson*, the objecting party must show

> (1) that he or she is a member of a cognizable racial or gender group; (2) that the opposing party has exercised peremptory challenges against members of a particular race [or gender]; and (3) that the facts and circumstances raise an inference that the party exercising the peremptory strikes does so for the purpose of striking a particular race [or gender].

*Id.* at (¶7) (quoting *Perry v. State*, 949 So. 2d 764, 767 (¶6) (Miss. Ct. App. 2006)). The defense must show that the totality of relevant facts produces "sufficient evidence to permit the trial judge to infer purposeful discrimination." *Id.* (citing *Strickland*, 980 So. 2d at 917 (¶¶7-8)). Although not a requirement, showing a pattern of discriminatory jury strikes can be one factor a court considers when determining whether the opponent of a strike has made a prima facie showing of discrimination. *H.A.S.*, 232 So. 3d at 126-27 (¶32) (Randolph, P.J., concurring). Here, the prosecution used ten peremptory challenges—nine against blacks. This was not just a "majority of potential jurors" but ninety percent of them. The trial court correctly found an inference of purposeful discrimination and requested the State

18

to provide race-neutral reasons.

¶31.    Further, Mississippi courts follow the United States Supreme Court's procedure that once race-neutral reasons are offered by the proponent of the strike, "the issue of whether a prima facie case of discrimination has been developed is moot." *Hughes v. State*, 735 So. 2d 238, 250 (¶27) (Miss. 1999) (citing *Hernandez*, 500 U.S. at 359). Here, the State provided its race-neutral reasons for the strikes upon request of the court. Therefore, any question about establishing a prima facie case is moot.

## II.    Step Two:  Race-Neutral Reasons

¶32.    Next, the burden shifts to the State to offer race-neutral reasons for its peremptory strikes. We must view the race-neutral reasons "in the light most favorable to the trial court's findings." *Walker v. State*, 815 So. 2d 1209, 1215 (¶12) (Miss. 2002) (citing *Berry v. State*, 703 So. 2d 269, 295 (¶99) (Miss. 1997)). "Trust is placed in a trial judge to determine whether a discriminatory motive drives the reasons given for striking a potential juror." *Id.* (citing *Webster v. State*, 754 So. 2d 1232, 1234 (¶7) (Miss. 2000)). "The determination of discriminatory intent will likely turn on a trial judge's evaluation of a presenter's credibility and whether an explanation should be believed." *Id.* (citing *Batson*, 476 U.S. at 98). One reason the trial court is afforded such deference in a *Batson* challenge "is because the demeanor of the attorney making the challenge is often the best evidence on the issue of race neutrality." *Id.* (citing *Webster*, 754 So. 2d at 1236 (¶10)).

¶33.    For Juror 2, the prosecutor gave the reason that "Mr. Thomas was conflicted with following the law," which was not an entirely accurate interpretation—Thomas never

actually stated he had a conflict with following the law. He said he had a "mixed" opinion about accomplice liability, felt it was "not fair," and was "on the fence" about it. The trial court accepted the reason as race neutral after stating more accurately that Juror 2 "had a mixed opinion as to the position of an accomplice and a snitch, and he would not agree with it."[9]

¶34. For Jurors 3, 4, 6, and 10, the prosecutor explained that these jurors all raised their cards in agreement with Juror 2 when asked if anyone else felt the same way as Juror 2. The trial court accepted this reason as race-neutral as well, allowing the strikes.[10]

¶35. The State exercised its ninth peremptory strike against Juror 23, a black person, because he "raised his card in agreement with Mr. Thomas." Defense counsel asked the trial court if that was on the record anywhere, which the court affirmed. The trial court then accepted the State's reason as race-neutral.

¶36. Our standard of review requires great deference to the trial court's findings on race neutrality. *Thorson*, 721 So. 2d at 593 (¶4). Being present to observe the prosecutor's demeanor, the trial judge found his race-neutral reasons credible. She did not find a

---

[9] Thomas and the other six jurors never stated they would be "unwilling to follow the law," as claimed by the State before the trial court and on appeal. In contrast, Thomas stated, "Not that I wouldn't follow it, but that I wouldn't agree with it." When asked in follow-up if he "wouldn't have a problem doing something [he doesn't] agree with," Thomas equivocated, "I'm saying follow it. I mean, I would hear it out --." Thomas reiterated that he did not find accomplice liability, as explained by the State, "fair." He also stated while he "fe[lt] weird" about "the whole telling portion," he had "no problem with hearing" from a snitch (Hurts).

[10] The trial court noted the State's fifth strike was against Juror 5 (Dill), a white person.

20

discriminatory motive driving the prosecutor's reasons. The State's concern about the potential jurors' opinion on accomplice liability and testimony was valid; the State wanted jurors who would give Hurts's testimony due consideration. Thomas's comments and the six other stricken jurors' agreement with them indicate they would possibly favor the defense regarding these issues, which is a valid race-neutral reason for a peremptory challenge.[11] As stated earlier, the standard for race-neutral reasons is quite low—"the establishment of a race neutral reason is not a difficult task." *Lynch v. State*, 877 So. 2d 1254, 1271 (¶49) (Miss. 2004) (quoting *Stewart v. State*, 662 So. 2d 552, 558 (Miss. 1995)). The reason will be considered race neutral even if unpersuasive or implausible unless a discriminatory intent is inherent in the objecting party's explanation. *Id.* (quoting *Randall*, 716 So. 2d at 588 (¶16)). The trial court did not err in finding no such inherent discriminatory intent of whether the potential jurors would give fair consideration to accomplice testimony was important because the State's lead witness Hurts was an accomplice. In fact, the defense adopted the same rationale to strike Juror 24 (Kaiser), a white juror, because she did **not** raise her card in agreement with Thomas and **would** be willing to accept the testimony of an accomplice/snitch. The prosecution agreed that was a race-neutral reason on its face, and the trial court allowed the strike, just as the court allowed the State's strike. We find the trial court did not err in finding the reasons were race-neutral.

### III. Step Three: Pretext

---

[11] Similarly, the trial court allowed the defense's first peremptory strike of Juror 8 because "her response appeared to be more in favor of the State."

¶37. Under the third step of *Batson*, "the burden remains on the opponent of the strike to show that the race-neutral explanation given is merely a pretext for racial discrimination." *H.A.S.*, 232 So. 3d at 124-25 (¶24) (quoting *Hicks v. State*, 973 So. 2d 211, 219 (¶23) (Miss. 2007)). The persuasiveness of the justification becomes relevant in this step. *Purkett*, 514 U.S. at 768 (citing *Batson*, 476 U.S. at 98; *Hernandez*, 500 U.S. at 359). The issue is "whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." *Miller-El v. Cockrell* (*Miller-El I*), 537 U.S. 322, 339 (2003). "The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Purkett*, 514 U.S. at 768.

¶38. First, we address whether Washington waived this step, as the State argues. The State claims that Washington did not rebut the State's race-neutral reasons, and, thus, his argument is waived on appeal. *See Eubanks*, 291 So. 3d at 319 (¶31) (quoting *Lynch*, 877 So. 2d at 1271 (¶49) ("It is incumbent upon a defendant claiming that proffered reasons are pretextual to raise the argument before the trial court. The failure to do so constitutes waiver.")).

¶39. In response, Washington argues that defense counsel objected to the prosecutor's reasons early in jury selection, thus his objection is preserved throughout the process. Washington refers to the State's challenge for cause of Juror 2 (denied), where defense counsel initially stated his disagreement with the prosecutor's interpretation of what Thomas

said. When the trial court analyzed the State's first through ninth peremptory challenges, the court did not give defense counsel a chance to offer a rebuttal. The court went down the list of jurors stricken, asking the prosecutor for a race-neutral reason and then directly moving on to the next juror. After the prosecutor had given his race-neutral reasons for nine of his ten peremptory strikes, during his tenth and last strike of Juror 27, defense counsel reiterated the same objection. After the prosecutor gave two race-neutral reasons for striking Juror 27 (who allegedly agreed with Thomas about having a "problem following the law" and also having a family member murdered), defense counsel made this general statement for all the State's challenges: "The only reason they have challenged them, Judge, is because they're black people. All of their challenges except one; isn't that right? Have been successfully challenged because of their race." Washington claims this statement and the earlier one preserve his objection that the State's reasons were based on pretext. We agree. He objected "early and [as] often" as he could.

¶40. Second, Washington claims that the trial court erred in failing to conduct the third step of the *Batson* analysis. The rebutting party must be given the opportunity to make a record of its pretextual argument in order for the trial court to consider whether the striking party's reason is pretextual. If the trial court does not give the rebutting party this opportunity, the trial court has failed to perform *Batson*'s third step. *See H.A.S.*, 232 So. 3d at 123 (¶15).[12]

---

[12] In *H.A.S.*, the trial court erroneously required the objecting party to prove a pattern of discrimination, thus step three of *Batson* was cut short, and made it unclear whether the striking party's reason was race neutral or pretextual. *H.A.S.*, 232 So. 3d at 124 (¶21). The supreme court remanded for a *Batson* hearing on whether the strikes were discriminatory.

¶41. While the record does not show that the trial court gave defense counsel an opportunity to offer a rebuttal on Jurors 2,[13] 3, 4, 6, and 10; after the State's tenth strike, he was given the opportunity to rebut the State's strikes and said, "I do not remember him saying that he would not follow the law." Then, regarding all the jurors, defense counsel said, "I do not remember any of these jurors, these African-American jurors who have been excluded from this jury panel saying that. . . . At the end, juror number two said he could follow the law as I remember." At this point, the trial judge heard everything defense counsel had to say and made a decision that the race-neutral reasons were not pretext as to all the jurors, stating, "All of their challenges have been -- all of these people said that they did not agree with an accomplice and mostly a snitch, and, therefore, they have a problem with it, and that is a race neutral reason . . . ." Thus, the trial court met its requirement under *Batson*'s third step.

¶42. Moreover, *Batson* "did not articulate a particular means of accomplishing the third step." *Pruitt v. State*, 986 So. 2d 940, 946 (¶20) (Miss. 2008) (citing *Batson*, 476 U.S. at 98). "On the contrary, . . . 'a state court need not make detailed findings addressing all the evidence before it.'" *Id.* (quoting *Miller-El I*, 537 U.S. at 347). Here, the trial court allowed the State and defense to make their records, and while the court was somewhat belated in

---

*Id.* Similarly, in *Miles v. State*, 346 So. 3d 840, 844 (¶9) (Miss. 2022), the trial court erred by not giving the rebutting party an opportunity to respond with any pretext argument and not performing *Batson*'s third step. The supreme court remanded under *H.A.S.* for a limited *Batson* hearing. *Id.* at 847 (¶18).

[13] The trial judge had, however, just heard from defense counsel regarding the challenge for cause on Juror 2 and may have thought defense counsel had said everything he wanted regarding the possible exclusion of that potential juror.

giving the defense an opportunity to rebut the State's stated reasons, the court duly considered the issue of pretext and rejected it. Therefore, step three was conducted. We find no error in this regard.

¶43.    As to pretext, Washington contends it was "obvious" that the prosecutor "fabricated" his race-neutral reasons in order to strike all the seven black jurors at issue. He continues that there was no need for the defense counsel to offer a specific pretextual rebuttal because the State's implausible race-neutral reasons "naturally" give rise to an inference of pretextual discriminatory intent. *See Snyder v. Louisiana*, 552 U.S. 472, 478, 485 (2008) (citing *Miller-El v. Dretke* (*Miller-El II*), 545 U.S. 231, 252 (2005)) (The prosecutor's pretextual explanations that a potential juror "looked nervous" and had student-teaching obligations were implausible, thereby showing purposeful discrimination.).

¶44.    Washington argues the prosecutor's misstatements follow a line of cases where the misrepresentations have "pretextual significance." In support, he cites to *Miller-El II*, 545 U.S. at 244 (In the third step of *Batson* analysis, unless the prosecutor had an "ulterior reason" for keeping a venire member off the jury he should have "cleared up any misunderstandings by asking further questions" before striking jurors.); *Flowers v. Mississippi*, 139 S. Ct. 2228, 2243 (2019) (A prosecutor's misrepresentations can be evidence of pretext.); and *Flowers v. State*, 947 So. 2d 910, 936 (¶67) (Miss. 2007) (One of the prosecutor's peremptory challenges was deemed pretextual because there was no evidence in the record to support the reason for the strike.).[14]

---

[14] Another reason that the Supreme Court found pretext in *Miller-Ell II* was a side-by-side comparison of stricken black venire members and white panelists allowed to serve.

¶45.    Washington likens this case to *Flowers v. Mississippi*, where the United States Supreme Court included "a prosecutor's misrepresentations of the record when defending the strikes during the *Batson* hearing" as a factor for trial courts to consider when evaluating whether racial discrimination occurred during peremptory strikes. *Flowers*, 139 S. Ct. at 2243. In *Flowers*, there was a pattern of factually inaccurate, very specific statements made by the prosecutor about black prospective jurors to justify race-neutral strikes and keep blacks off the jury. *Id.* at 2250. The false factual statements about jurors to justify strikes were as follows: one juror worked with one of the defendant's sisters, another juror was a close friend of the defendant's sister, one juror tried to cover up a lawsuit, and one juror was the defendant's aunt. *Id.*

¶46.    In this case, the prosecutor's alleged misstatements were as follows:

[During the challenges for cause:]

> BY [PROSECUTOR]: Juror number two, Mr. Thomas, had a hesitancy and said he would have a disagreement and a problem with following the law as given to him by the Court.
>
> BY THE COURT: [Defense counsel?]
>
> BY [DEFENSE COUNSEL]: I did not see it as a hesitancy.
> . . . .
>
> BY [DEFENSE COUNSEL]: Everybody said they would

---

*Miller-El II*, 545 U.S. at 241. If a prosecutor's reason for striking a black panelist applies just as well to a white panelist permitted to serve, this evidence tends to prove purposeful discrimination. *Id.* Also, contrasting voir dire questions were asked to black and non-black panel members about their views on capital punishment. *Id.* at 256. Here, however, no comparison of the potential jurors' opinions can be made because only black potential jurors "agreed with Thomas." Also, there were no disparate questions asked of the potential jurors of different races as in *Miller-El II*.

follow the law.  At the end of voir dire, Mr. Thomas said that.

BY [PROSECUTOR]: *He said he disagreed with it, and he would have a problem with it.*  That's what he said.

BY [DEFENSE COUNSEL]: That's not what I remember him saying.

BY THE COURT: My notes reflect that he said that he had a mixed opinion about an accomplice and a snitch, and he wouldn't agree with it, but I don't believe that's reason to strike him for cause.

[During the defense's peremptory challenge (D-10) of Juror 24 (Kaiser):]

BY [PROSECUTOR]: Your Honor, just for the record, the question was could they follow the law of accomplice testimony and co-defendant testimony.  That was the question that the number two said *he had a problem with following the law.*

[In response to the defense's peremptory challenge (D-11) of Juror 26 (Lerch):]

BY [PROSECUTOR]: Your Honor, the State would say that's a pre-textual explanation. . . . *[T]he question again was whether or not they could follow the law* regarding accomplice testimony.  Mr. Lerch said he could follow -- he didn't say he had a problem with the law.

[In exercising S-10 against Juror 27 (Hughes):]

BY [PROSECUTOR]: The State would exercise S-10 on Mr. Hughes, and the reason for Mr. Hughes, he was one that raised his card and said he agreed with number two.  That *he couldn't follow the law.*  Didn't agree with the law --.
. . . .

BY THE COURT: [Defense counsel]?

BY [DEFENSE COUNSEL]: Number one, *I do not remember him saying that he would not follow the law.*  I do not remember any of these jurors, these African-American jurors who have been excluded from this jury panel saying that.
. . . .

BY [DEFENSE COUNSEL]: At the end, juror number two said *he*

27

*could follow the law* as I remember.

> BY [PROSECUTOR]: Your Honor, the State has to give a race neutral reason. The fact that number two had -- and we've already done number two for that matter. *Number two says he was conflicted. He had a problem. He didn't agree with that.* That is a race neutral reason. Number twenty-seven agreed -- when I asked did anyone else agree or feel the same way as number two, number twenty-seven was one of those that raised his cards.
>
> . . . .
>
> BY [PROSECUTOR]: Additionally Mr. Hughes also said he had a family member that was murdered, but the main reason the State seeks to exercise a peremptory challenge on him was because *of his problem with following the law.*

Regarding the race-neutral reasons the State offered for striking the seven jurors, Washington now argues much more strenuously on appeal that the prosecutor's repeated "mischaracterizing [of] the record" by making "false claims" about Thomas's concerns indicates a "discriminatory pattern of strikes." Defense counsel, however, did not make this specific argument before the trial court.[15] On appeal, Washington is arguing a much harsher interpretation of the record. While the prosecutor inaccurately interpreted Thomas's concerns in some respects, the trial court was not asked to find whether he was "mischaracterizing" or intentionally making "false claims" about what Thomas said in order to mask discriminatory strikes. After an independent review of the record, we see no evidence to justify such claims as to Thomas or the other jurors who agreed with him. While Thomas did not admit to having a "problem" with following the law, he did state that he

---

[15] Only once did defense counsel even hint at such a claim when he said, "[T]he State is citing as reasons for their peremptory people that have held up their hands in response to some question not born out in the record . . . ."

28

disagreed with it. Even if the prosecutor misstated Thomas's concerns as having "a problem" following the law, Thomas voiced his disagreement with the law and equivocated as to how he would "follow it, I mean, I would hear it out --." Hearing something out and following the law are not necessarily the same thing. What Thomas did say was sufficient to concern the prosecutor as to whether Thomas would follow the law.

¶47. In *Johnson v. State*, 875 So. 2d 208, 213 (¶8) (Miss. 2004), the Mississippi Supreme Court affirmed as a "race-neutral reason" the State's belief that a juror could not follow the court's instruction even though the potential juror did not say he could not follow the law. *See also Manning v. State*, 735 So. 2d 323, 337, 340 (¶¶22, 31) (Miss. 1999) (citing *Johnson v. State*, 529 So. 2d 577, 584-85 (Miss. 1988)) (The State's concern when a potential juror "has doubts" about his or her ability to follow law and court's instructions and vote for the death penalty when appropriate was found to be a legitimate race-neutral reason for a peremptory strike.).

¶48. Washington cites *Robinson v. State*, 773 So. 2d 943, 949-50 (¶27) (Miss. Ct. App. 2000), as analogous because, as Washington claims, both here and in *Robinson* the prosecutor's reasons for the strikes were such "implausible or fantastic justifications" that they ought to be found a "pretext for purposeful discrimination." *Id.* (citing *Purkett*, 514 U.S. at 768). In *Robinson*, the defendant's manslaughter conviction was reversed for a new trial under *Batson*. *Id.* at 950 (¶31). This Court found the "improbable," very detailed race-neutral reasons offered by the State "to be pretexts for purposeful discrimination." *Id.* at 949-50 (¶27). The State's "contrived" reasons for some strikes included the "wildly

29

speculative assertion" that two potential jurors might be parents of illegitimate children, one juror was "staring intently" at the prosecutor although he did not sense hostility, and another juror was sleeping during voir dire, although the trial judge did not witness it. *Id.* at 950 (¶28). "Viewed in the totality of the circumstances," this Court found "sufficient indications that something other than a race-neutral effort to select a fair and impartial jury . . . was at work." *Id.* at (¶31).

¶49.    The United States Supreme Court has held "that a state court's finding of the absence of discriminatory intent is 'a pure issue of fact' accorded significant deference . . . ." *Miller-El I*, 537 U.S. at 339 (citing *Hernandez*, 500 U.S. at 364). "There will seldom be much evidence bearing on that issue [of whether counsel's race-neutral reasons should be believed], and the best evidence often will be the demeanor of the attorney who exercises the challenge." *Hernandez*, 500 U.S. at 365.

¶50.    Under the circumstances of this case, we do not find the prosecutor's misstatements that Thomas had "a problem with following the law" indicate a deliberate fabrication showing discriminatory intent. Just as Washington had a legitimate interest in keeping Juror 8 off the panel because her responses seemed to favor the State, the State had a legitimate interest in empaneling jurors who unequivocally stated they could follow the law at issue in the case. Further, the prosecutor asked all the potential jurors the same question about whether they agreed with Thomas—different races were not asked different questions. Moreover, all the jurors who felt the same way as Thomas were treated the same way and stricken; there was no disparate treatment along racial lines of potential jurors answering the

30

questions the same way.

¶51. Washington claims on appeal that because the prosecutor did not follow up with specific questions for Jurors 3, 4, 6, 10, 23, and 27 to clarify why they "fe[lt] the same way" as Thomas indicates an "ulterior motive" by the State to strike black potential jurors. Washington did not present this theory to the trial court; further, there is no evidence in the record to justify such a conclusion. Admittedly, although the prosecutor did not attempt to clarify which of Thomas's comments each member of the venire agreed with, "the prosecutor is not required to question prospective jurors about the racially neutral reasons later given, as long as the source of the information and the practice itself are not racially discriminatory." *Johnson*, 529 So. 2d at 584 (citing *Lockett v. State*, 517 So. 2d 1346, 1352-53 (Miss. 1987)). We do not find that a lack of further examination of the potential jurors indicates a motive to keep blacks off of the jury as Washington claims. Further, this reason was not presented to the trial court as evidence of pretext. Accordingly, we find no error.[16]

¶52. Lastly, Washington contends the trial court "compounded" the prosecution's "misrepresentations" when it improperly "augmented" the State's discriminatory reasons for the strikes by "modifying" and misstating Thomas's stated concerns, thereby rejecting the State's race-neutral reasons and interjecting her own. We do not agree. First, defense

---

[16] Washington makes an additional argument in his reply brief that because the prosecutor gave a second reason to strike Juror 27—a family member was a victim of a crime—it indicates pretext requiring reversal. Washington adds that the prosecutor did not seek to strike another juror (whose race is unknown), who was also a victim of crime, even though she and Juror 27 agreed this fact would not affect their judgment. Washington claims the State's second reason was an improper "afterthought" under *Miller-El II*. However, the record does not reflect that the reason was an "afterthought"; the prosecutor stated the reason directly after giving his first reason about Thomas's being "conflicted."

counsel did not make this assertion to the trial judge herself. Washington points to two times when the trial judge inaccurately reiterated that the State's reason for the strikes was because "those people said they had a problem with an accomplice and a snitch being a witness in this case." Thomas actually said that he had "no problem" with an accomplice or a snitch being a witness but did "feel weird" about "the whole telling portion." However, Washington fails to acknowledge that the trial judge accurately stated Thomas's concerns twice. Initially, the trial judge correctly reiterated Thomas's concerns when denying the State's challenge for cause of Juror 2, stating, "My notes reflect that [Thomas] said he had a mixed opinion about an accomplice and a snitch, and he wouldn't agree with it, but I don't believe that's a reason to strike him for cause." A few moments later, she gave the exact same correct reiteration of what Thomas said as a race-neutral reason to accept the State's peremptory strike of Juror 2. The trial judge was operating without the benefit of a transcript, using her notes to summarize what Thomas had said much earlier. The trial judge's later conclusion that Thomas "had a problem with an accomplice and a snitch being a witness in this case" did not "augment" any discriminatory reason offered by the State as Washington contends. In fact, defense counsel adopted the same phraseology when successfully challenging Juror 24.

## CONCLUSION

¶53. The trial court's *Batson* rulings were not clearly erroneous or against the overwhelming weight of the evidence. During jury selection, the trial court's duty is to ensure that although the process may not be perfect, the jury finally empaneled can render

32

an impartial verdict. *Palm v. State*, 748 So. 2d 135, 138 (¶9) (Miss. 1999) (quoting *Puckett v. State*, 737 So. 2d 322, 332 (¶23) (Miss. 1999)). We find the trial court did just that. Accordingly, we affirm Washington's convictions and sentences.

¶54. **AFFIRMED.**

**CARLTON AND WILSON, P.JJ., GREENLEE, McDONALD, LAWRENCE, McCARTY AND EMFINGER, JJ., CONCUR. WESTBROOKS, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION, JOINED BY McDONALD, J.; McCARTY, J., JOINS IN PART. SMITH, J., NOT PARTICIPATING.**

**WESTBROOKS, J., SPECIALLY CONCURRING:**

¶55. Although the State was able to overcome Washington's *Batson* challenge, this record presents a deeper concern for me—an issue that was not presented or preserved for appellate review but warrants both thought and scrutiny. I write separately because the draw of only 36 people for the jury pool at the genesis of this first-degree murder trial cannot confidently have provided a fair representation of peers in this community. An insufficient selection of potential jurors compromises and dooms the democratic purpose of a jury. In fact, this deficiency at the beginning of these proceedings deprives citizens of their power as jurors and defendants of their right to an impartial jury.

¶56. A fair and impartial jury serves not only to protect the defendant but to grant any qualified citizen a right to participate in the democratic process. As Justice Marshall once stated, there are three basic principles that are safeguarded under the Equal Protection Clause: (1) "the right of the defendant to 'be tried by a jury whose members are selected pursuant to nondiscriminatory criteria,' . . . [(2)] the right of a member of the community not to be assumed incompetent for and be excluded from jury service on account of his race, . . .

33

and [(3)] the need to preserve 'public confidence in the fairness of our system of justice[.]'" *Holland v. Illinois*, 493 U.S. 474, 491-92 (1990) (Marshall, J., dissenting). It has always been understood that "[s]erving on a jury is a right, privilege and responsibility of all our citizens." *Thorson v. State*, 721 So. 2d 590, 594 (¶8) (Miss. 1998) (discussing discrimination of juror on the basis of religion). "[It] is the most substantial opportunity that most citizens have to participate in the democratic process." *Flowers v. Mississippi*, 139 S. Ct. 2228, 2238 (2019) (citing *Powers v. Ohio*, 499 U.S. 400, 407 (1991)).

¶57. Jury service empowers the ordinary citizen to be an instrument of public justice in their own right and in their own respective community. "Equal opportunity to participate in the fair administration of justice is fundamental to our democratic system." *J.E.B. v. Ala. ex. rel. T.B.*, 511 U.S. 127, 145 (1994). "[O]ur democracy itself, requires that the jury be [] truly representative of the community, and not the organ of any special group or class." *Glasser v. United States*, 315 U.S. 60, 86 (1942), *superseded by* Fed. R. Evid. 104 *as recognized in Bourjaily v. United States*, 483 U.S. 171, 178 (1987). Therefore, "the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Taylor v. Louisiana*, 419 U.S. 522, 538 (1975); *Duren v. Missouri*, 439 U.S. 357, 363-64 (1979).

¶58. "A fair trial in a fair tribunal is a basic requirement of due process." *Hyundai Motor Am. v. Applewhite*, 319 So. 3d 987, 1002 (¶53) (Miss. 2021) (quoting *In re Murchison*, 349 U.S. 133, 136 (1955) (citing U.S. Const. amend. XIV, § 1; Miss. Const. art. 3, § 14)); *see*

*Hudson v. Taleff*, 546 So. 2d 359, 362-63 (Miss. 1989) (stating that the defendant has a constitutional right to "a trial by an impartial jury" (quoting Miss. Const. art. 3, § 26)). "[D]ue process alone has long demanded that, if a jury is to be provided the defendant, regardless of whether the Sixth Amendment requires it, the jury must stand impartial and indifferent to the extent commanded by the Sixth Amendment." *Morgan v. Illinois*, 504 U.S. 719, 727 (1992) (citations omitted).

¶59. To ensure a fair and impartial jury, the trial court (and by extension the clerk) must cast a wide net when summoning jurors. *See generally Taylor*, 419 U.S. at 538. "[T]he Sixth Amendment affords the defendant in a criminal trial the opportunity to have the jury drawn from venires representative of the community[.]" *Id.* at 537. In Mississippi, our Legislature has furthered this privilege by providing that "[i]t is the policy of this state that all persons selected for jury service be selected at random from a fair cross section of the population of the area served by the court[.]" Miss. Code Ann. § 13-5-2 (Rev. 2014).

¶60. In other words, the jury summons is the precursor to reaching a sitting jury of twelve that is a fair cross-section of the community. *Taylor*, 419 U.S. at 528. But when a jury pool or venire is so small that after each side exercises the allotted peremptory strikes, there is doubt as to whether there are enough jurors left to sit on the panel or serve as alternates. *State v. Veal*, 930 N.W.2d 319, 344 (Iowa 2019) (Appel, J., concurring in part) ("[O]ur approach to fair-cross-section requirements will be meaningless if a party is able to exercise peremptory challenges in a fashion that eliminates the few African-Americans who are on the pool or venire from the petit jury."). By implication then, the very size of the venire can

35

give the appearance of a venire and a resulting jury that is not a fair representation of the community. *Cf. Batson v. Kentucky*, 476 U.S. 79, 87-88 (1986) ("Selection procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice.").

¶61.   It is ultimately the trial court's duty to ensure that the defendant is provided with a fair and impartial jury.  Hence, our nation has given the trial courts wide discretion and authority in determining when to take corrective action.[17]  Ideally, the trial court would, in these circumstances, continue the trial to a later date and summon additional jurors.  But more often than not, that is not the case.  In turn, our community and judicial system suffer the most harm.  To this end, I am gravely concerned about a first-degree murder trial in Adams County that began with a 36-person jury pool.

¶62.   The relatively minuscule size of the jury pool had a high potential of leading to a jury that was not a reasonable representation of the community in Adams County.  There are over 28,000 persons from which a jury could have been drawn in Adams County; however, only

---

[17]    [J]udges have been able to take corrective action even when the initial jury gathering process fails to provide a sufficiently diverse group.  For example, when presented with a predominantly Caucasian group of prospective jurors, Northern District of Illinois Judge Milton Shadur simply adjourned the trial for a couple of days until an adequately multiracial jury could be summoned. In these instances, judges were able to take the steps they felt were appropriate to provide a defendant with an acceptable jury pool.

Ashish S. Joshi & Christina T. Kline, *Lack of Jury Diversity: A National Problem with Individual Consequences*, American Bar Association (Sept. 1, 2015) (citation omitted), https://www.americanbar.org/groups/litigation/committees/diversity-inclusion/articles/2015/lack-of-jury-diversity-national-problem-individual-consequences/.

36 venire persons were empaneled for a first-degree murder case. Even more concerning is the fact that Adams County has a racial makeup of 64% nonwhite and 36% white.[18] But in Washington's trial, more than half of the individuals who made up this jury pool were white. The prosecution then exercised 10 of his peremptory strikes—9 of them against black potential jurors. In the end, Washington's jury panel consisted of 10 white jurors, 2 black jurors, and 2 white alternates.

¶63. The United States Supreme Court held in *Duren*, 439 U.S. at 364, that "petit juries must be drawn from a source fairly representative of the community." *Id*. at 363 (quoting *Taylor*, 419 U.S. at 538). The Court explained that

> in order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Id*. at 364. In *Duren*, the petitioner established a prima facie case of unfairness because he provided statistical evidence of the total population and the racial composition of that population. *Id*. The petitioner also demonstrated that the unfair action had been occurring frequently and repetitively. *Id*. at 366; *contra Gray v. State*, 887 So. 2d 158, 165 (¶14) (Miss. 2004) ("Gray offered no evidence at trial or in the present case demonstrating 'systematic exclusion.'"); *Gray v. Epps*, 4:04-cv-234-LG, 2008 WL 4793796, at *1 (S.D.

___

[18] U.S. Census Bureau, Population Estimates Program, QuickFacts Adams County, Miss., Table V2022, https://www.census.gov/quickfacts/fact/table/adamscountymississippi# (updated July 1, 2022).

Miss. Oct. 27, 2008) (party did not evidence "the racial composition of the venire"); *but see Thomas v. State*, 818 So. 2d 335, 339-40 (¶5) (Miss. 2002) (drawing the venire from more than one district because the jury pool was small due to many of the jurors being related to the defendants in a capital case where each side received twelve peremptory strikes). Applying the law to the facts of this case, it is clear that the burden is on the objecting party to show that the number of potential jurors in the venire is insufficient and not a fair representation of the community. *Billue v. State*, 64 So. 3d 589, 592 (¶10) (Miss. Ct. App. 2011). However, in this case, I am without sufficient information in the record to determine if there has been systemic exclusion.

¶64. Any party who notices a small jury pool can alert the trial court of the potential misrepresentation. *Compare Duren*, 439 U.S. at 366, *with Hamilton v. Hammons*, 792 So. 2d 956, 962 (¶26) (Miss. 2001), *overruled on other grounds by Dedeaux v. Pellerin Laundry Inc.*, 947 So. 2d 900, 908-09 (¶16) (Miss. 2007). When venires lack large numbers for potential jurors, it has a palpable domino effect: (1) inconsiderably overruled for-cause and peremptory challenges, (2) a lack of diversity in the petit jury, (3) a biased jury, and (4) a potentially flawed verdict. In my opinion, neither Washington's jury pool nor the petit jury was a reasonable reflection of the Adams County community. In a situation where there is a thirty-six-person jury pool, and each party exercises twelve of their peremptory strikes, only twelve persons are left to sit on the jury. At this juncture, the trial court has an interest in limiting or declining both the State's and the defendant's legitimate for-cause challenges

and peremptory strikes.[19] *See Hamilton*, 792 So. 2d at 962 (¶30) ("The trial court did acknowledge that the small size of the jury pool could cause the court to be less lenient to grant strikes for cause."). Because the trial proceeds without the fair and equal use of the State's and the defendant's challenges and strikes, the door is open for a potentially biased petit jury.

¶65. In this case, however, Washington did not object to the small size of the venire or prove purposeful discrimination after the prosecutor provided race-neutral reasons for each strike. Thus, nine black jurors were struck. But this does not necessarily mean that Washington was provided a fair and impartial jury. "[I]n the real world of criminal trials against black defendants, both history and math tell us that a system of race-based peremptor[y] [strikes] does not treat black defendants and black prospective jurors equally with prosecutors and white prospective jurors." *Flowers*, 139 S. Ct. at 2242. So while it cannot be proved that the prosecutor's actions exhibited purposeful discrimination,[20] the reality is that Washington's jury consisted of only two black jurors in a predominately black county. As such, I fear that with jury pools of this size (thirty-six or less), it is highly probable, if not inevitable, that a defendant will receive an unfair trial. Just because the State met the legal standard set by our high courts, that does not mean discrimination did not occur.

---

[19] Were the trial court to allow all the challenges and strikes, the court would have no choice but to declare a mistrial. MRCrP 23.5; *accord Markham v. State*, 209 Miss. 135, 46 So. 2d 88, 89 (1950) (jury must consist of sufficient number of impartial jurors).

[20] It is worth noting that the prosecutor handling this trial was black.

¶66.    I am aware that a defendant is not entitled to a jury of his race. *Batiste v. State*, 121 So. 3d 808, 849 (¶90) (Miss. 2013); *Pitchford v. State*, 45 So. 3d 216, 228 (¶36) (Miss. 2010); *Underwood v. State*, 708 So. 2d 18, 28-29 (¶31) (Miss. 1998). I am also aware we have stated that as long as the use of each peremptory strike and for-cause challenge was constitutionally sound, the use of the challenges and strikes, in combination, to strike black jurors is also constitutional. *Pinkney v. State*, 538 So. 2d 329, 346-47 (Miss. 1988), *vacated on other grounds and remanded*, 494 U.S. 1075 (1990). I emphasize once again that even when the letter of the law is followed, this does not mean that the spirit of the law has been executed. Therefore, I urge trial courts to proceed in a manner that will eliminate any doubt as to the integrity of our jury selection in our judicial system. I specially concur.

**McDONALD, J., JOINS THIS OPINION. McCARTY, J., JOINS THIS OPINION IN PART.**

40